Carl Hugo Gamble, Floyd E. Kelly, Jr., and
Harold D. Beckett, Jr., Plaintiffs in Error,

*v.*

State of Tennessee, Defendant in Error.

383 S.W.2d 48.

(*Jackson,* April Term, 1964.)

Opinion filed August 19, 1964.

GALLOWAY & CLINTON, Memphis, for Carl Hugo Gamble.

JOHN M. HEISKELL, Memphis, MONTEDONICO, BOONE, GILLILAND, HEISKELL & LOCH, Memphis, of counsel for Floyd E. Kelly, Jr.

MARVIN C. GOFF, JR., Memphis, WINCHESTER, GOFF, WINCHESTER, HAWKS & WALSH, Memphis, of counsel, for Harold D. Beckett, Jr.

GEORGE F. McCANLESS, Attorney General, EDGAR P. CALHOUN, Assistant Attorney General, for defendant in error.

MR. JUSTICE HOLMES delivered the opinion of the Court.

The plaintiffs in error, who hereinafter will be referred to as defendants, were convicted of grand larceny and sentenced to serve not more than 6 years in the State Penitentiary. The Judge overruled defendants' motions for new trial. They have perfected their appeals to this Court and have filed numerous assignments of error. Prior to the occasion which gave rise to this prosecution,

the defendants were members of the Memphis Police Department.

Shortly before two o'clock on the morning of March 10, 1962, the Big Star Grocery & Market at the corner of Macon Road and Victor Drive, in the city of Memphis, was broken into and the safe therein containing over $10,000.00 in money was removed. Within less than one hour after the safe was taken it was found by the police, unopened, in a panel truck which had been abandoned in a "lonely area" on Water's Edge Street, just off of Birchfield, in the eastern part of the Frayser area of the city of Memphis about 7 miles from the grocery. At the time of this crime, the defendants Kelly and Beckett were on duty as police officers in an unmarked detective cruiser. The defendant Gamble was not on duty.

Officer Nixon of the Memphis Police Department testified that he and his partner, Officer Hubbard, were proceeding west on Macon Road shortly before 2:00 A.M., on this morning when they saw a truck, without its lights on, pulling away from the Big Star Store, turning north on Victor Drive. These officers followed the truck. When it got to the intersection of Victor Drive and Graham Street, a few blocks north of the grocery, this truck passed a car. As Nixon and Hubbard passed this car, they saw it was occupied by the defendants Kelly and Beckett. Nixon testified these defendants flashed their spotlight on his car and blinked their lights, so Hubbard and Nixon stopped. The defendants Kelly and Beckett pulled alongside of them with the defendant Kelly driving. Prior to this time, while following the truck which had its back doors open, Officers Nixon and Hubbard had seen what they thought was a safe in this truck. When

the defendants Kelly and Beckett pulled alongside Officers Nixon and Hubbard, Officer Nixon testified:

"A. I asked them when they pulled up, I asked if they were with the truck; he said he was.

"Q. Did you ask what that was in the truck?

"A. Yes, Sir; he said, 'That's a gocart I'm taking home.' I said, 'It looks like a safe to me.' And at that time nothing else was said about the safe."

While this conversation was taking place the truck had proceeded several blocks on Graham and had turned off on another street. Officers Nixon and Hubbard then returned to the Big Star Grocery and found the front door had been broken in and immediately notified their superior by radio. In a few minutes the defendants Kelly and Beckett arrived at the Big Star Grocery, having heard the radio transmission relative to this breakin. This was normal procedure.

While they were waiting for their superiors to arrive at the scene, a young lady living across the street from the grocery came to the scene. She testified that shortly after going to bed at 1:30 that morning she heard a noise in front of the Big Star Grocery. She looked out her window and saw two men run and jump in a car that was stopped fairly close to the front door of the grocery. This car started off and she saw a truck start right behind it. Both vehicles turned north on Victor. In a few minutes she heard the noise of police radio at the store and saw uniformed officers on the scene and came to report what she had observed. She then returned to her home.

In a few minutes Lieutenant Smith, who was the superior of Officers Nixon and Hubbard, arrived at the scene.

Officer Nixon testified that the defendant Beckett told Lieutenant Smith the lady had stated it was a white panel or pickup truck, whereupon Officer Nixon corrected him by saying that she had only told them it was a light colored van-type truck. Lieutenant Smith testified that the defendant Beckett told him the lady had stated it was a white pickup truck and that he broadcast on the radio the description of the truck as a white pickup truck. He further testified:

"* * * and as I cleared that Officer Nixon shook his head and said no, that is not right. He told me it was a light colored panel truck and at that time Officer Beckett agreed with him, and that is what I put on the air then."

After making this broadcast, Lieutenant Smith, accompanied by Officers Nixon and Hubbard, started across the street to interview the young lady and, at this time, Officers Nixon and Hubbard advised Lieutenant Smith of what had transpired between them and the defendants Kelley and Beckett just before the discovery of the breakin. As these officers went to interview the young lady the defendants Kelly and Beckett drove away from the scene. Lieutenant Smith directed Officers Nixon and Hubbard to follow them, but they were unable to locate these defendants.

About 2:40 that morning Lieutenant Bailey of the Police Department was ordered to go to the truck at Birchfield and Water's Edge to process the safe and truck for fingerprints and other evidence. When he arrived at the scene of the truck he was instructed to come back to James Road and Birchfield Street to meet Assistant Chief McCarroll of the Memphis Police Department at that location, which, according to a map of

the city of Memphis introduced in evidence, is not over one mile from the place the truck was found. He had passed this intersection on his way to the truck and saw no one there. When he returned to this intersection shortly after 3:00 A.M., he saw the defendant Gamble standing there. When he inquired of Gamble as to what he was doing there at that hour of the morning, Gamble stated he was waiting for Kelley to pick him up. It was a cold rainy night and the defendant Gamble sat in the car with Lieutenant Bailey and they talked for a few minutes, then Lieutenant Bailey received a radio call to meet Chief McCarroll at James Road in the town of Raleigh. The defendant Gamble rode with Lieutenant Bailey to Raleigh, where Lieutenant Bailey was instructed to return to the truck and process it. He let the defendant Gamble out of his car at a telephone booth in front of a filling station near Birchfield and James Road. He noticed that the defendant Gamble had "quite a bit" of mud on his shoes.

Shortly thereafter Chief McCarroll went to the truck and learned that Lieutenant Bailey had let the defendant Gamble out of his car at the telephone booth. Chief McCarroll went to this location and asked the defendant Gamble who he was calling. This defendant stated he was calling Kelly. The defendant Gamble was then disarmed and placed under arrest. He told Chief McCarroll that the defendants Kelly and Beckett had picked him up at a drive-in ice cream place across from the Fairgrounds in Memphis, that he had ridden around with these defendants, that they had taken him to the vicinity of Birchfield and James Road and let him out, that the defendant Kelly had agreed to pick him up there when Kelly got off duty at three o'clock that morning. He told Chief McCarroll that his purpose in being in that area was to

visit a married woman who lived in the vicinity. He refused at all times to give the name of the party he stated he had visited and refused to give any address of this party. The defendant Gamble was then taken to Police Headquarters, where he made substantially the same statement that he had related to Chief McCarroll.

Later that morning the defendants Kelly and Beckett were brought to Police Headquarters and questioned separately. Each of these defendants originally denied that they had been with the defendant Gamble that evening. Later, when confronted with contradictions in the statements of the three defendants, Kelly and Beckett admitted they had falsely stated that Gamble had not been with them. They then stated they let Gamble out of their detective cruiser at Parkway and Summer, which the map made an exhibit shows is some four miles from Birchfield and James Road. The defendant Beckett told the investigating officers that they used Gamble in making a check at The Palms Club for law violations and stated that all three defendants went in The Palms Club. Several employees of The Palms Club testified none of the three defendants were in that establishment on the night in question. The defendants Kelly and Beckett both admitted having a conversation with Officers Nixon and Hubbard at about the time and place testified by those officers. They denied using a spotlight to stop the squad car. They denied any recollection of a reference being made to a safe in a truck. The defendant Beckett denied any reference being made to a gocart.

The defendants Kelly and Beckett testified at the trial; the defendant Gamble did not testify. Both Kelly and Beckett denied having any connection whatever with the theft of the safe or the breaking and entering of the

grocery. They testified that Gamble rode with them in the detective cruiser on the night in question, and both testified they let him out of the car shortly after midnight on James Road in the vicinity of Birchfield. Both admitted having a conversation with Officers Nixon and Hubbard about two o'clock that morning near the intersection of Victor Drive and Graham Street. The defendant Kelly testified that he did not hear all of the conversation between the defendant Beckett and Officer Nixon, that he didn't pay any attention to this conversation and wasn't interested in it. He denied giving any signal by lights to Nixon and Hubbard. The defendant Beckett testified that, when these defendants talked to Officers Nixon and Hubbard, Nixon said something that he, Beckett, could not hear, that Nixon said "something about 'Do you think he's safe?' I couldn't hear and I opened the door and stepped out of the car and leaned toward their car; and at that time Nixon asked me, 'What did you all ever do with Charlie Hunt last night?' " At no time when being questioned by the police officers did either of these defendants say there had been any conversation about Charlie Hunt when they talked to Nixon and Hubbard.

The trial of this case began on April 29, 1963 and was concluded on May 8, 1963. The record is voluminous. It would unduly extend this opinion to review all of the facts and circumstances appearing in the record which point toward the guilt of the defendants. All of the defendants by their assignments of error contend that the evidence preponderates against the verdict of guilty and in favor of the innocence of the defendants.

■■ It is well settled law in this State that the verdict of a jury in a criminal case approved by the Trial Judge removes the presumption of innocence and raises

a presumption of guilt in this Court. The burden here is upon the defendants to show that the evidence preponderates against the verdict. The conflicts in testimony and the credibility of the witnesses have been settled by the verdict. *Cooper v. State,* 123 Tenn. 37, 138 S.W. 826, *Batey v. State,* 191 Tenn. 592, 235 S.W.2d 591, *Holt v. State,* 210 Tenn. 188, 197, 357 S.W.2d 57.

The proof offered by the State to establish the criminal agency of the defendants consists almost entirely of circumstantial evidence. In *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, this Court, speaking through the present Chief Justice, at 451 and 452 of 203 Tenn., at 456 and 457 of 313 S.W.2d, fully stated the rules to be applied in testing the sufficiency of circumstantial evidence. Applying these rules to the evidence in this case, it cannot be said that the evidence preponderates against the verdict or that the evidence is in any respect insufficient to establish the guilt of each of the three defendants. All assignments of error relating to the sufficiency of evidence are overruled.

By appropriate assignments of error, all of the defendants urge that the Trial Court erred in instructing the jury as to the offense of larceny and that the verdict of the jury finding the defendants guilty of grand larceny is void because the defendants were not indicted for the crime of larceny. The indictment in this case is in two counts. The first count of the indictment charges that the defendants:

"on the 10th day of MARCH A.D., 1962 before the finding of this Indictment, in the County aforesaid, did commit the offense of burglary in the THIRD degree by unlawfully, feloniously and burglariously break into and enter THE BUSINESS HOUSE OF STEPHER-

SON BIG STAR NO. 11—a business owned and operated by STEPHERSON MACON, INC., a corporation in the NIGHT time with intent unlawfully, feloniously and burglariously to steal, take and carry away the personal property therein contained and did feloniously and burglariously steal, take and carry away ONE SAFE OF THE VALUE OF $600.00; OLD AND RARE COINS OF THE VALUE OF $500.00; AND THE SUM OF TEN THOUSAND ONE HUNDRED NINETY-SIX & 42/100 ($10,196.42) Dollars, good and lawful money of the United States, a more particular description of which is to the Grand Jurors aforesaid unknown, ALL OF THE VALUE OF $11,296.42—the proper goods and chattels of STEPHERSON BIG STAR NO. 11—a business owned and operated by STEPHERSON MACON, INC., a corporation with the felonious intent to convert the same to their own use and to deprive the owner thereof against the peace and dignity of the State of Tennessee.''

The second count of the indictment charges the defendants with receiving and concealing stolen property.

The Trial Judge instructed the jury that this indictment charges the defendants with the offenses of burglary in the third degree, larceny, and receiving stolen property, and gave the jury instructions as to the law applicable to each of these offenses. The jury found the defendants guilty of grand larceny.

The general rule with reference to the joinder of charges of burglary and larceny in the same count of an indictment is stated, as follows, in 13 Am.Jur.2d, Burglary, Section 41, Page 346:

''Burglary and larceny are an exception to the general rule that two distinct offenses cannot be charged in

the same count, and an indictment charging both bur-
glary and larceny cannot be demurred to on the ground
or duplicity. The exception is as well established as the
rule itself and it is clear that a burglary and a larceny
committed at the same time may be thus united.''

In *Williams v. State,* 1 Tenn. Cases (Shannon) 473,
474, it is stated:

''It is argued that the court below erred in refusing
to quash the indictment. It charges that the defendant
broke and entered a certain mansion-house of the
prosecutor, with intent and for the purpose, the goods
and chattels of the prosecutor, then and there being,
feloniously to steal, take and carry away. The particu-
lar goods, their quantity or value, intended to be stolen
are not stated in this connection, but in the same count
it is further charged that the defendant did then and
there, steal, take and carry away certain specific goods
of the prosecutor. We hold this to be a good indictment
not only for the larceny but also for the house break-
ing.''

■ Count one of the indictment in the present case,
as did the indictment in the Williams case, charges the
defendants with the offenses of burglary and larceny. As
held in the Williams case, such an indictment is valid.
The proof as heretofore stated fully supports the charge
of grand larceny. The jury did not find the defendants
guilty of receiving and concealing stolen property, as
charged in the second count of the indictment. Had the
jury found the defendants guilty under the second count
of the indictment, then the case of *Franklin v. State,* 202
Tenn. 666, 308 S.W.2d 417, and other cases which are
cited in that case, relied upon by the defendants, would
be in point, for the evidence offered by the State in this

case shows the defendants guilty of larceny, and not of receiving and concealing stolen property.

By T.C.A. sec. 39-904, burglary in the third degree is defined as the breaking and entering into a business house with the intent to commit a felony. T.C.A. sec. 39-4203 defines grand larceny as the felonious taking and carrying away any personal goods over the value of $100.00. Since these two offenses may be charged in the same count of an indictment, and are charged in the indictment in this case, the defendants' assignments of error now being discussed are without merit and are overruled.

It is next assigned as error that the Court gave a part of the charge to the jury orally, in violation of T.C.A. sec. 40-2516. The record shows that, after a little over three hours deliberation, the following occurred:

"Jury knocked on Jury Room Door and told the Deputy Sheriff they had reached a verdict but to be (sic) instructed how to write the verdict."

The Court thereupon ordered the jury brought into the courtroom. The jacket in the case was passed to the Court. The Court then stated:

"Gentlemen, the form of your verdict—now, the Court is referring only to the form, Mr. Foreman; it does not correspond to the instructions. The verdict has to correspond to the form the Court outlined to you in writing. Referring only, now, gentlemen, to the form of your verdict, not the content, you will find the form in the jacket. Another matter relating to the form where you used the names of your defendants in your verdict, gentlemen of the jury, name the defendants as outlined for you. The Court feels you should return

to the Jury Room and be guided more by the written form for your verdict; so, you'll return to your room.

(JURY OUT) (2:30 p. m.) (RECESS) (JURY IN) (2:32 p. m.)

"THE COURT: Gentlemen, the Court addresses you again as to the form, The Court is not referring to the contents of the verdict. Now, Mr. Foreman,—Mr. Brown, you served as Foreman, according to the form of your verdict you have named the defendants and you have language immediately after that—relating only to the form of the verdict.

"JURY FOREMAN: May I say something, please?

"THE COURT: Don't go into the content of the verdict. You should strike out where you have the words 'or any of them'".

Thereupon the jury retired to the jury room and in three minutes returned into open Court with their verdict, which was accepted by the Trial Judge.

The statute requiring the Trial Judge to reduce every word of his charge to writing in a felony case, T.C.A. sec. 40-2516, has not been amended since it was enacted in 1873. In 1875 this statute was construed by the Court in *Frady v. State,* 67 Tenn. 349, 351. In that case, after the jury had deliberated and returned into Court announcing they could not agree, the Trial Judge orally told the jury that "some twelve men had to settle the matter; that a verdict should be rendered if they could do so without violating their conscience, and under the oath they had taken." The jury then retired and in a short time returned a verdict. In holding the statute was not violated, the Court stated:

"The purpose of the statute was to require the judge to give written instructions upon all the legal questions arising in the case, but not to prevent that necessary and indispensable intercourse between judge and jury in the progress of the trial being had verbally which relates to their conduct or action in other particulars than in regard to the rules of law by which they should be governed in rendering their verdict.

"All that relates to the principles of law by which they shall be governed in arriving at and rendering their verdict—the instructions of the court to the jury —should be in writing. All other proper communications by the court to them may be verbally made."

The Frady case is quoted with approval in *Tomlin v. State,* 207 Tenn. 281, 291, 339 S.W.2d 10. The most recent case in which the construction of T.C.A. sec. 40-2516 was before the Court is *Taylor v. State,* 212 Tenn. 187, 369 S.W.2d 385, in which Mr. Chief Justice Burnett spoke for the Court, as follows:

"It is true that sec. 40-2516, T.C.A., requires, and under this statute it is imperative, that the trial judge give his directions as to the law of the case in writing. This statute is valid and imperative and not merely directory, but must be observed. Where though an oral statement is made after the case has thus been correctly tried on its merits with proper written instructions the plaintiff in error was not prejudiced by this oral statement by the judge explaining an instruction, and the making of such statement is not reversible error. *Munson v. State,* 141 Tenn. 522, 213 S.W. 916. This Munson case is the closest one we have to the question in this State. The question though here presented is very ably discussed by the author of 23A,

C.J.S. Criminal Law sec. 1301, page 732, where among other things it is said: 'The charge or instruction required by law to be reduced to writing is only that which the court may have to say to the jury in regard to the principles of law applicable to the case and to the evidence; * * * *statements as to the form* or character *of the verdict' need not be in writing.*

"We think this is reasonable and applicable to the requirement of the statute." (Emphasis supplied.)

In the Taylor case, as in the case now before the Court, the Trial Judge, after fully charging the jury in writing, and after the jury was ready to return its verdict, orally stated certain matters to the jury pertaining to the form of the verdict. This action of the Trial Judge was held not to contravene the provisions of T.C.A. sec. 40-2516.

■ In the present case, the written charge which the jury took with them fully set forth the form of the jury's verdict. The Trial Judge referred the jury to the written charge for the purpose of correcting the form of their verdict. Under the prior holdings of this Court, this was not reversible error.

At the trial Inspector Wilkins, the Chief Radio Dispatcher of the Memphis Police Department, under whose direction and supervision a log of all police radio communications is kept, testified to the various radio transmissions made on the police radio on the night in question. The record shows the Memphis Police Department operates its radio system on two frequencies, one of which maintains communications with the regular squad cars and the other is assigned to detective cruisers, motorcycle and radar units, and various auxiliary components of the Police Department. The logs for both radio

frequencies, showing the time of all police radio calls on this night, the number of the police car making the call or being dispatched and the place to which dispatched, were introduced in evidence as exhibits to the testimony of this witness. The record shows these logs are made by the dispatcher on duty contemporaneously with the act and are the original written records of all radio dispatches. A number of assignments of error made by the defendants relate to the introduction of these logs.

The record reflects that the witness Wilkins was first asked to testify to certain information contained in the log without the prior introduction of the logs in evidence. Counsel for the defendants objected. The jury was excused and there was extended argument as to the proper procedure. In the course of this argument, defense counsel stated:

"We have a statute that makes the records of the regular course of business available per se, instead of getting away from the old shop book really (sic) we studied in school and the Legislature passed a statute, as I recall it, Mr. Dyer, making the records kept in the regular course of business admissible in evidence."

Counsel was, of course, referring to the Uniform Business Records as Evidence Act, T.C.A. sec. 24-712 et seq. Later in this argument, counsel for the defendants stated:

"I am objecting to their use for any purpose unless they are introduced in evidence in their entirety as exhibits being records kept in the regular course of business and if they are introduced then I want to inspect them."

Thereafter, the jury was returned to the courtroom and the radio logs for March 9 and 10, 1962 were intro-

duced in evidence in their entirety. At the time the logs were introduced, counsel for the defendants was allowed to ask the witness questions relating to their admissibility. After the witness testified that the radio log being introduced contained all entries made from 7:00 A.M., on March 9, 1962 to 7:00 A.M., on March 10, 1962, counsel for the defendant stated:

"That is all I want to ask. Thank you. I have no objection."

Thereafter a recess was taken to allow defense counsel to examine the logs.

The radio logs are kept in blue ink. A number of pages of these logs have numerous notations, primarily figures, written in red ink. When this was observed by defense counsel, they were allowed to examine the witness in the absence of the jury. He testified that the red marks were a part of a recent survey conducted by the Association of Chiefs of Police and were not part of the original entries made by the dispatcher in the regular course of business. With that matter being understood, counsel for defendants then stated, "We have no objection", and the witness then proceeded to testify from the logs, which showed that from 12:32 A.M., until 3:00 A.M., when the defendants Kelly and Beckett went off duty, there were no radio transmissions to or from the detective cruiser they were driving.

During the cross-examination of the witness Wilkins, it was brought out that the log showed that at 12:06 A.M., on the night in question, the car occupied by the defendants Kelly and Beckett was on special assignment at 2375 Summer Avenue and came back in service at 12:23 A.M., that on the line of the log containing this information

the figures "2383" were written in parenthesis in red ink at the side of the page. The witness testified that when the entries made on the log were subsequently checked against a tape recording made of all police radio transmissions, it was seen that the address 2375 Summer Avenue should have been 2383 Summer and the notation "2383" was placed in red ink to indicate this. A few other instances of notations made upon the log in red ink at the time the information shown on the log was compared with the tape recordings were found. None of these other notations had any connection with the activities of the defendants as reflected by the log. After this information was elicited on cross-examination, the defendants made a series of motions, which were overruled by the Court and are the subject of assignments of error. By these assignments, it is insisted that the radio logs introduced were not the best evidence, but that the tape recording was the original record, and that it was error for the Court to refuse to strike from the evidence the radio logs and the testimony of the witness Wilkins with regard thereto.

It is further assigned as error that the Court did not require the State to produce and present to the jury the original tape recordings of all broadcasts made during the period of the investigation of this crime. It is also asserted that the Trial Court erred in not requiring the State to make available to counsel for the defendants these tape recordings for use in cross-examining the witness Wilkins, and that the Court was in error in overruling defendant's motion that the Court play back the tape recordings and determine whether or not they contained matters material to the defense of the defendants. Defendants also assign as error the action of the Trial Court in overruling a motion to have the tape recordings

introduced in evidence and preserved as an exhibit in the case for the benefit "of the appellate court in case there was an appeal."

■ We have carefully examined the radio logs which were made exhibits in the cause and have examined in detail the testimony relating to these logs. These radio logs are original records, made in the regular course of the business of the Police Department at the time of the event, and were admissible in evidence under the provisions of T.C.A. secs. 24-712 to 24-715. Any additions made to these logs subsequently were made in red ink and it was fully explained to the jury that such additions were not a part of the original record to be considered by them. The reason for these notations in the log was stated by the witness Wilkins, as follows:

"The corrections that I make are for my own information and to check with the dispatcher at a later time and ask him why did he do so and so, for disciplinary purposes."

■ At no time did the defendants obtain a subpoena *duces tecum* and seek to introduce the tapes in evidence at the trial as a part of their proof. The witness Wilkins testified several hours time would be required to play back these tape recordings. Obviously the radio logs are not secondary records, but are original records showing certain specified data with reference to radio transmissions, some of which would appear on the tape and some of which would not.

The defendants rely upon *State ex rel. Stewart v. Follis,* 140 Tenn. 513, 205 S.W. 444, in support of the contentions made by these assignments of error. In that case an accounting firm had been employed to report

upon the condition of the accounts of a county trustee. The Court held this report to be competent but not necessarily conclusive and pointed out that counsel had an opportunity to test the accuracy of the report by cross-examining the witness through whom it was introduced by referring to the original accounts of the county trustee. In no sense of the word is the radio log introduced in this case comparable to an audit made up from an original record. Rather, as we have stated, the radio log is itself an original record made contemporaneously with the happening of the event.

We have gone into some detail in showing just how the questions raised by these assignments of error arose in the Trial Court. Counsel for the defendants correctly recognize that these radio logs were admissible in evidence. It was only after it appeared that certain notations had been made on these logs in red ink that these questions were raised. It was made crystal clear to the jury that the red ink notations on the logs were not a part of the original record to be considered by them.

After carefully reviewing the various contentions made by the assignments of error now being discussed, we are satisfied that the Trial Judge did not commit any reversible error in ruling upon the matters set forth by these assignments.

While counsel for one of the defendants was making his argument to the jury, the Assistant District Attorney General objected to the nature of the argument and, while his objection was being discussed, offered to play the tape recordings of the police broadcasts to the jury at that time. Defense counsel was arguing to the jury that the State was withholding evidence in the case. The State objected to this argument and pointed out that

the Court had ruled upon what evidence should be presented. Then the State's representative stated:

"if they want this tape, I'll play it right now."

Defense counsel then moved for a mistrial, which motion was overruled, and this action of the Court is assigned as error.

When defense counsel was interrupted by counsel for the State, he was arguing that his client should not be convicted because of the failure of the State to produce the tape recording of the radio dispatches and then stated to the jury, "Let me ask you one other question about how fair they have played with you in the proof in this case."

This Court has recognized that statements otherwise improper may be made by counsel when counsel for the opposite side has opened up the subject. In *Coke v. State,* 208 Tenn. 248, 345 S.W.2d 673, this Court stated:

"It is also objected that the Attorney General, in his closing argument, commented upon the defendant's failure to offer evidence in support of his reputation as to truth and veracity within the community. The defendant cannot be heard to complain upon this subject due to the fact that he opened up the subject to comment in his closing argument."

Here, neither side produced the tape recording and offered it in evidence through a witness. The general rule with reference to retaliatory statements and remarks made by the State in a criminal prosecution is stated in 23A, C.J.S. Criminal Law sec. 1108, Pages 210 et seq. At Page 215 of this text, it is stated:

"Types of statements, remarks, or comments, including some which might otherwise be objectionable, to which the rule permitting retaliatory or answering statements and remarks, as discussed supra subdivision a of this section, has been applied include statements, remarks, or comments outside of the evidence or record generally, * * * on a failure to introduce certain evidence or to call certain witnesses."

The entire arguments of all counsel are included in the bill of exceptions. Although the prosecutor should not have made the statements he made in discussing his objections to the argument, we cannot say, after studying all of the evidence and the arguments of counsel that the result of the trial was in any way affected by this. Therefore, under T.C.A. sec. 27-117, we overrule the assignments of error relating to this offer to play the tape recording.

Assignment of error number 16 on behalf of the defendant Gamble is that the Court erred in failing and neglecting to charge to the jury the theory of that defendant. This assignment is not discussed in the written brief. No special request was offered. The charge of the Trial Judge fully covered the law on all issues. This assignment is overruled.

■ It is next assigned as error that the Trial Court erred in permitting the attorney for the State to argue to the jury and comment upon the failure of the defendant Gamble to testify. The argument of the Assistant Attorney General complained of by this assignment was as follows:

"He (defendant Gamble) says, 'I'm waiting for Kelly; I'm waiting for Kelly.' Can you acquit these men,

gentlemen, because Mr. Heiskell says there was a delay in arresting them? What happens, he comes to Gamble and says, "Gamble, what are you doing out here?" He says, 'I have been with a woman.' Cherchez la femme! Pardon my French; I believe that is correct, 'Look for the woman.' And the record is still, fourteen months later, as silent as a graveyard as to who that woman was."

On the argument of the motion for a new trial, the defendant Gamble contended that the prosecutor in the last above quoted sentence used the word "he" and not the word "the record". The controversy as to what was said was resolved by the testimony of the court reporter, which was given on the motion for a new trial, and by the Trial Judge. The language actually used did not comment upon the failure of the accused to testify, but commented upon the absence of any evidence in the record as to the identity of the woman the defendant Gamble stated he was visiting at the time the safe was stolen.

In *Hays v. State*, 159 Tenn. 388, 393, 19 S.W.2d 313, 315, this Court stated:

"The distinction running through the authorities seems to be that, while no argument of guilt shall be based on the failure of the defendant to himself take the stand, this immunity does not extend to his failure to offer other witnesses in his defense, in explanation and rebuttal of incriminating facts and circumstances adduced."

This same rule is expressed by the Court in *Ford v. State*, 184 Tenn. 443, 449, 201 S.W.2d 539, 541, in the following language:

"It is, of course, now well settled that our statute (Code Section 9783) (now T.C.A. sec. 40-2403) providing that no presumption of guilt of the defendant shall arise from his failure to testify in his own behalf, has application only to the personal testimony of the defendant himself and does not extend to apparently available testimony by others."

The charge of the Trial Judge correctly stated to the jury that the failure of the defendant to testify cannot be considered for any purpose against him nor can any inference be drawn from the failure of a defendant to take the stand in his own behalf. The argument of the prosecutor complained of by this assignment of error was not improper.

It is next assigned as error by the defendant Gamble that the Trial Judge, in charging the law of alibi and the law relative to expert testimony and character witnesses, invaded the province of the jury. The charge of the Trial Judge as to the law of alibi is in complete conformity with the rules approved by this Court in *Odeneal v. State,* 128 Tenn. 60, 64, 157 S.W. 419, *Warren v. State,* 178 Tenn. 157, 160, 156 S.W.2d 416, and *Bright v. State,* 191 Tenn. 249, 255, 232 S.W.2d 53. The charge upon expert testimony follows the rules approved by this Court in *Persons v. State,* 90 Tenn. 291, 16 S.W. 726, an*d Mullendore v. State,* 183 Tenn. 53, 62, 191 S.W2d. 149.

With reference to the charge on character witnesses, the Trial Judge expressly limited this part of his charge to the defendants Kelly and Beckett, who were the only defendants offering character witnesses in their behalf. The Court instructed the jury to consider this evidence along with all the other evidence in the case and instructed them that a person of good character may,

of course, violate the law, but all other things being equal, a person of good character is not so likely to violate the law as one of bad character. The cases of *Espitia v. State,* 199 Tenn. 696, 288 S.W.2d 731, and *Dykes v. State,* 201 Tenn. 65, 296 S.W.2d 861, which are relied upon by the defendant, are not authority for the contentions made by the assignment of error now being discussed. We find no error in the charge of the Trial Judge.

. The final assignment of error contends that the Trial Judge should have granted a new trial upon the ground of newly discovered evidence. The newly discovered witness was one Ernest L. (Doc) Green, who testified at the hearing of the motion for a new trial. On this hearing he testified that on the night in question he had been at Shelby Center drinking beer with a friend of his and that, when the sale of beer in the county was stopped at midnight, he started to his home in Memphis, that it takes 15 or 20 minutes to drive from Shelby Center to The Palms Club, which is located on Summer Avenue just inside the city limits, that he stopped at The Palms Club and bought 4 cans of beer to take home  with him prior to the time that sales of beer are stopped in the city of Memphis at 1:00 A.M. He did not have a watch with him and could not definitely state what time he purchased this beer at The Palms Club, but, when he purchased it, he saw the defendant Kelly on the parking lot at The Palms Club.

The radio log shows that at 12:32 A.M., on March 10, 1962 the car of defendants Kelly and Beckett was on special assignment at 5141 Summer Avenue, the address of The Palms Club. The testimony of this witness would add nothing to the evidence already in the record. If this witness had material evidence to give in the case,

no reason of any substance is given for his failure to come forward before or during the trial of the case. He had known the defendant Kelly for quite some time, read the accounts in the newspapers at the time of Kelly's arrest, and knew when the case was being tried. The Trial Judge was correct in denying this ground of the motion for new trial.

We find no error in the judgment of the Trial Court. All of the assignments of error are overruled, and the judgment is affirmed.