RALPH CANADY, STEVE PARKER and WILLIAM
GARVIN ALLEN, Alias WILLIAM GARRIN
ALLEN, II,
Plaintiffs in Error, v. STATE OF TENNESSEE,
Defendant in Error.

461 S.W.2d 53.

Court of Criminal Appeals of Tennessee. Feb. 3, 1970.

Certiorari Denied by Supreme Court Nov. 2, 1970.

338

340

Eugene D. Smith, Cincinnati, Ohio, Robert E. Lillard and David Vincent, Nashville, Whitworth Stokes, Jr., Memphis, for plaintiffs in error.

David M. Pack, Atty. Gen., Arnold Peebles, Jr., Asst. Atty. Gen., Thomas H. Shriver, Dist. Atty. Gen., John J. Hollins and Robert S. Brandt, Asst. Dist. Atty. Gen., Nashville, for defendant in error.

## OPINION

RUSSELL, Judge.

On the night of January 16, 1968, two Metropolitan Nashville police officers were shot to death shortly after stopping an automobile occupied by the three defendants and two other men. All five were indicted and jointly charged with the first degree murder of officer Thomasson. Canady, Parker and Allen were tried together (the other two, Alexander and Herron, not being apprehended) and all three were found guilty of first degree murder and the punishment set at ninety-nine years in the penitentiary. Each has perfected his appeal in the nature of a writ of error, citing numerous alleged errors. All are represented by individually retained highly skilled counsel.

All defendants allege error in the action of the trial court in admitting into evidence a tape recording of the police radio transmissions relative to this occurrence. It is contended that (1) the tape recording was not properly authenticated, (2) that much of its contents was

hearsay, (3) that its use denied the defendants their Sixth Amendment right to confront the witnesses against them, and (4) it was so inflammatory as to be inadmissible for that reason.

In order to pass upon this question, it is necessary to briefly summarize factual theories. The State contends that the defendants and the other two occupants of the car stopped immediately before the officers were shot had been engaged (in whole or in part) in a money order theft and passing scheme in Nashville, that they armed themselves with two loaded rifles intending therewith to prevent capture, that the car that they were riding in was an unlawfully converted leased car carrying stolen license plates and that in its trunk were stolen money orders and the equipment for filling them out for cashing; and that the defendants tried to get away from the two police officers who were trying to stop them, and failing in that, they stopped at a place which lent itself to shooting down the officers and escaping. This theory requires proof that the defendants were consciously bent upon escape, that there was a chase, and that the shooting was the foreseeable culmination of the venture. The defendants each deny any knowledge of illegal activity, or of arming to help effect escape, or of knowledge that police were trying to stop them, or of knowledge that anyone in their car would shoot the police.

The tape recording was introduced and played concurrently with testimony by a Sgt. Lilly, who identified the voices. The tape tended to indicate, probatively, that Officer Johnson (the other officer killed) set about to stop defendants' car to see who was in it, that Officer Thomasson (for whose slaying defendants were on trial)

was on the route being taken by the car and that he stopped it and its driver attempted to run over him and drove off, that Johnson chased the car as its occupants attempted to get away and that Thomasson joined in the chase, that the car went into a dead-end street, that the officers were shot "all to pieces," that three men jumped out, and they were armed with sawed-off shotguns, that Thomasson was shot three times, and that the men left traveling eastward on the railroad. The probative value of the tape is dramatically illustrated in one instance by the fact that the defendants contended that they heard no siren prior to being stopped, and the last transmission of Officer Johnson is clearly in concert with a loud siren.

Clearly, therefore, the probative force of the tape recording played a substantial part in these convictions, and its competency is a condition precedent to the validity of these judgments.

The trial court allowed none of the witnesses to testify as to what they heard and said in connection with these transmissions, and would not permit the introduction into evidence of a typewritten transcript of the tape recording. We assume that the trial court felt that the recording was the best evidence.

We further note that, by full agreement and stipulation, part of the broadcasts and the times thereof were introduced into evidence. The record also reflects that some defense counsel, at times, almost conceded the admissibility of the tape, if properly verified.

It is also of interest that some of the transmissions by the deceased officers were unquestionably in fact erroneous. There were no sawed-off shotguns used, Mr.

Thomasson was shot more than three times, they were not on Fifteenth Street, etc. The jury was well aware of this.

We feel that the tape recording was admissible as part of the res gestae, that it was adequately authenticated and verified, that such evidence is one of the accepted exceptions to the right of confrontation, and its nature and content was not so inflammatory and prejudicial as to require its exclusion despite its probative value in the interest of a fair trial. We have carefully studied the contents of the tape recording, and have listened to it as the jury did. We feel that the transmissions of Officer Thomasson were relatively subdued, considering the circumstances, and were not per se inflammatory. The probative value of this evidence clearly outweighed any prejudicial effect resulting from hearing the voice of the dead officer.

On the matter of authentication, the chain of possession was clearly established; and the theory of possible editing was negated by testimony that the tape represented the transmissions of the time in question and was the same as when it was first played shortly after the fact. Our Supreme Court has heretofore held that radio logs of a police department, made in the regular course of business, were admissible under our Uniform Business Records as Evidence Act, T.C.A. §§ 24-712 to 24-714; and, by clear implication, that the tapes were also admissible. Gamble v. State, 215 Tenn. 26, 383 S.W.2d 48.

An excellent general statement regarding res gestae is found in Underhill's Criminal Evidence, Fourth Edition, p. 348, § 191, as follows:

"Res gestae is from the Latin meaning 'things done', and includes the circumstances, facts and declarations incidental to the main fact or transaction, necessary to illustrate its character, and also includes acts, words and declarations which are so closely connected therewith as to constitute a part of the transaction. The expression, res gestae, as applied to a crime, means the complete criminal transaction from its beginning or starting point in the act of the accused until the end is reached. What in any case constitutes the res gestae of a crime depends wholly on the character of the crime and the circumstances of the case.

"The rule of res gestae under which it is said that all facts which are a part of the res gestae are admissible, is a rule determining the relevancy and not the character or probative force of the evidence. If the court determines that the fact offered is a part of the res gestae, it will be accepted, because, as it is said, that fact is then relevant. Relevancy is always a judicial question to be determined according to the issue which is to be tried. Taking the main facts which are embraced in the commission of any crime and which are essential to be proved, it will be found, in most instances, that they are connected with others which are not essential to be proved, but which tend more or less to prove those facts which are to be proved. Every occurrence which is the result of human agency is more or less implicated and involved with other occurrences. One event is the cause or result of another, or two or more events or incidents may be collaterally connected or related. Circumstances constituting a criminal transaction which is being investigated by the jury, and

which are so interwoven with others, and with the principal facts which are at issue that they can not be very well separated from the principal facts at issue without depriving the jury of proof which is necessary for them to have in order to reach a direct conclusion on the evidence, may be regarded as res gestae.

"These facts include declarations which grow out of the main fact, shed light upon it, and which are unpremeditated, spontaneous, and made at a time so near, either prior or subsequent to the main act, as to exclude the idea of deliberation or fabrication. A statement made as part of res gestae does not narrate a past event, but it is the event speaking through the person, and therefore is not excluded because hearsay, and precludes the idea of design. This rule is applicable to all facts which are relevant, explanatory, or illustrative of, or which characterize the act. Whether utterances may be admissible as res gestae, though separated by time or distance from the principal transaction, depends upon the circumstances of the particular case. Whether evidence is admissible as a part of the res gestae rests largely in judicial discretion."

We hold that the various radio transmissions were a part of the "things done," the res gestae; and that the properly authenticated tape recording of the transmissions was a legal and proper way to prove them.

■ All three plaintiffs in error assign as error the action of the trial court in granting the State's motion to have State's witnesses Beverly Amelia Howard and John C. Walker declared to be hostile witnesses and interrogated by cross-examination, etc. Miss Howard was a

young college student who was visiting socially in the apartment occupied by the defendants and from which they left just prior to the shooting. She gave two written statements to investigating officers subsequent to the crime. On direct examination she testified that these statements were not correct; at which time Assistant District Attorney General Hollins claimed surprise and asked that he be allowed to examine her as a hostile witness. In a hearing before the judge, the witness testified that on that morning she had advised the District Attorney General, Mr. Shriver, that when she gave the statements that she was confused and afraid and "said yes to anything." The Court pronounced her a hostile witness. The two written statements were introduced into evidence. The witness said that the parts of the statements about "some of the guys having guns" and "about me walking out to the car" weren't true. However, she admitted telling the officers upon her interrogation that "Each one of them had one (gun)"; and that she told them that she saw the defendants get into the car with the guns by simply answering "yes" to leading questions "to get out of there." She admitted telling the officers everything contained in the two statements, but denied the truthfulness of the aforesaid portions, but corroborated the balance. In other words, her testimony corresponded to the statements, except in the aforesaid particulars, which she admitted agreeing to but denied the correctness of. She was cross-examined on the events of the evening in detail by counsel for each defendant.

The other "hostile" witness, John C. Walker, is a young man who was a friend of all the defendants prior to this occasion, and was with them socially in the apart-

ment from whence they left just before this shooting. Two days after the shooting he was officially questioned, in the presence of Mr. Vincent, his attorney (now one of the lawyers for defendant Parker), and gave some statements which Mr. Vincent admitted were contrary to the beginning portion of his trial testimony. Surprise was claimed and the Court permitted his treatment as a hostile witness by the State. His investigation interrogation was never formalized into a statement, but did supply the basis for a memorandum which the State used to cross-examine him from. The trial Court would not allow the introduction of the memorandum into evidence, and instructed the jury that there was no statement given by this witness. The witness denied that he saw the defendants get into the car and denied that he saw any of them with the rifle. He said that there was no rifle in the back seat, as he observed there; and "if it was a rifle it was in the front seat," because he didn't see there. He categorically denied telling that he had seen the rifle. He testified that he stood by the back door and told the defendants good-by and then went back into the house before they got into the car and left. He saw into the open trunk of the car after it was loaded, and identified a picture of the trunk and its contents that the State put in evidence by him. He testified that he saw a "thirty ought six" rifle in the bedroom of the apartment at 1906 Hermosa belonging to the "owner" of the apartment, and that he owned two, he thought. He testified that all five of the men indicted were putting material into the trunk of the car, but he couldn't remember who put what in. He testified, in response to a leading question by the State, that all five started to leave town hurriedly. He denied that he had seen some of the stolen money order

blanks and stamps in their possession and denied that he had during the interrogation told the police that. He testified that after the five men left in the car that he went from 1910 Hermosa (from whence they left) back to 1906, watched television, saw and heard thereon a news bulletin in which it was related that two police officers had been shot with shotguns, and was "relieved" because they'd been shot with a shotgun, and policemen thereafter told him that the men had been in a white Chevrolet and he didn't "know anybody with a shotgun or a white Chevrolet." He testified that he saw Parker loading some of the material into the car trunk, but denied that he ever told the police that Parker was the leader of the group. He didn't remember saying that defendant Allen was second in command, but wouldn't deny saying it. He didn't remember telling the police what Allen had said he would do to a policeman if he tried to stop him, and didn't remember saying that he didn't believe him.

On cross examination by Canady's counsel, Walker stated that Canady had been intending to go back to Cincinnati to get a job for the two prior days, and that Canady was not a member of the Student Non-Violent Co-ordinating Committee. He stated that to his knowledge no notes were taken at his police interrogation. He stated that Earnest Cowan lived at 1910 Hermosa (from whence the group left) and Richard Hughes and William Bostic at 1906. Hughes, Walker, and Parker had been to Fisk in Hughes' red Michigan Ford at about 7:30 P.M., and had brought the girls back to 1910. He had seen Canady earlier in the day at 1906. Canady had told him that he didn't know how he was going to get back to

Cincinnati, that he didn't have enough money. He testified that the police confiscated two rifles and a shotgun from Hughes apartment.

Witness Walker was a hospital psychiatric ward patient at the time of his testimony.

He testified that all of the men slept in the apartments "when they wanted to." He testified that Canady had been down a week or two "maybe" visiting him.

We feel that the trial Court properly allowed these two witnesses to be treated as hostile witnesses and hence led and cross examined. Each had previously given information important to the State's case that varied materially from what they wanted to testify to. They were each in a position to have information of critical importance, but their friendship for the defendants tended naturally to make them hostile to the State. We hold that the trial Court's rulings were authorized under King v. State, 187 Tenn. 431, 215 S.W.2d 813, wherein our Supreme Court quotes with approval the following rule from Wharton's Criminal Evidence, Vol .1, 10th Edition, to wit:

> "The general rule obtains in criminal as well as civil cases, that a party cannot impeach his own witness, but this is subject to the exception that where a party is compelled to call an indispensable witness, or a witness that is hostile taking the party by surprise, such witness may be impeached by the party calling him. This exception is equally applicable to the prosecution, because the State must bring forward all witnesses obtainable, and it would be unfair to the prosecution where it could not contradict an unexpectedly hostile

witness. In such case the hostility may be shown by the witness himself or otherwise, and he then may be examined as to his contradictory statements; but the impeachment of one's own witness is limited to those cases where his testimony is in direct contradiction to his prior statements, and he cannot be impeached where he is merely reluctant to give testimony or unless the testimony is actually prejudicial."

■ It is also assigned as error that the testimony of hostile witnesses Howard and Walker was violative of the defendants' right of confrontation. We find no merit to this contention. Miss Howard testified to the same facts as were set out in her introduced statement, with the aforementioned exceptions and she admitted signing the statement as written, but sought to explain the variances. She was thoroughly cross-examined. There was, therefore, no deprivation of confrontation as to her. Walker gave no prior statement that was introduced in evidence, so that his testimony was all given in the presence of defendants and their attorneys. The State did examine him from a memo of a prior interrogation, but this memorandum was not permitted to be introduced. There is no merit to this assignment.

■ ■ The allegation of error based upon an alleged violation of the right of confrontation is also insisted upon by Parker and Allen with regard to certain out-of-court statements made by each of these co-defendants and introduced into evidence.

Allen wrote a letter which said the following:

"To whom it may concern: I am the only one that did any shooting in the incident with the police. Steve

Parker, Ralph Canady and the other fellows had nothing to do with it. By the time you get this letter I will be out of the country. Also, here are some prints to prove who I am.

> William G. Allen
> January 23, 1968"

As to his own statement, Allen cannot validly contend that there was a breach of confrontation. Clearly, this statement is exculpatory of Parker and Canady. As to Canady, it corresponds to his own testimony. As to Parker, he did not know who did the shooting, but said that he didn't. The contention that the statement tended, by reason of its obvious purpose to help Parker and Canady, to show an allegiance between Allen and the others and thus tend to incriminate the others is ingenious, but it cannot truly be said that Allen's statement incriminated Parker and Canady. It fell squarely into their theories; and, the attempt by Allen to help them is at least as consistent with their theory of innocence as it is with the State's theory of guilt.

■ Parker and Canady allegedly made statements to detectives Grouppe and Dunn in Cincinnati after their arrests; and Allen made a statement to FBI agents Bullard and Williams in New York after his arrest there. Parker's statement was substantially a skeleton of his trial testimony, and was not inculpatory of Canady or Allen (any more than was their own testimony as to the same occurrences). The same could be said of Canady's responses to interrogation. Neither gave a formal statement.

■ Allen was interrogated by FBI agents and they

testified that he denied guilt and writing the letter and gave them some information that the other four defendants had arrived together in the Plymouth automobile a few days before the shooting, that the car was stolen, and that they all used it. Counsel for Canady asked for and got a jury instruction that this testimony could not be considered against the other defendants. Counsel for Parker objected to it altogether, was overruled and an exception taken. Allen's alleged interrogation statement was, in effect, that he didn't know who did the shooting; and was substantially the same as his testimony. However, he took the stand and denied giving almost all of the answers attributed to him, and specifically denied saying that the other four arrived together in the stolen Plymouth. This latter statement was the only part of his alleged statement that was contrary to Parker's own testimony and theory; and we feel that any error in the admission of this inculpatory reference to Parker (and Canady) was cured not only by the Court's instruction to disregard, but by the fact that Allen took the stand and was fully questioned and cross examined on the subject.

 Parker and Allen allege error in the introduction by the State of many witnesses whose names were not listed upon the presentment, in view of the provisions of T.C.A. § 40-2407 requiring the District Attorney General to endorse upon the indictment the names of the witnesses he intends to have summoned. All witnesses used by the State were subpoenaed and there was ample time for defendants to ascertain their identities and talk with them. There is no showing of prejudice from this technical non-compliance with the statute, and we hold under our Supreme Court authority that the District At-

torney General was not limited to the use of those witnesses whose names were so listed. Douglass v. State, 213 Tenn. 643, 378 S.W.2d 749.

All three defendants contend that the evidence is insufficient to support their respective convictions. All admit being in an illegally converted lease car bearing stolen license plates with stolen money orders and a stamp used for passing same in the trunk and with two loaded rifles in the passenger compartment when that car was stopped by two police officers and the officers slaughtered. Only two other men could have been the trigger men, i. e. their fugitive companions. Canady testified that Allen was one trigger man, and this is strongly supported by the undisputed evidence as to the location in the car of the 30-30 rifle and Allen. Allen admitted writing a letter admitting being the slayer.

It was shown that the two presumed riflemen left the scene together, each carrying a rifle; and the rifles were stashed together beneath a yard hedge. It is almost certain that Allen was one of these men, and he and Canady admittedly were together subsequent to the shooting. The other rifle was available to Canady on the back seat, and there is strong circumstantial evidence that he was the second gunman. But regardless of his actually firing a gun or not, he is equally involved and guilty under the law which convicts Parker of murder.

Parker was the driver. His theory is one of innocent, unknowing involvement. He contends that he happened to be driving a car that happened to be carrying one or more persons bent on homicide, all unknown to him. He further theorizes that he stopped the car upon police

command, did all that was required of him, was surprised when "someone" shot the officers, and ran from fright. He knew nothing of who did the shooting. All who testified agreed that Parker did not shoot anyone.

An in depth study of the evidence sweeps aside Parker's veil of innocence and shows a clear preponderance of evidence of guilt. Some, if not all, of the occupants of the Plymouth car were involved in its unlawful conversion and the theft of the license plates thereon. Parker was in actual possession of the car. Unquestionably, these men, four out of five of whom were from Cincinnati, had been living in and around the same two apartments for days. None gave a believable explanation of why they were together. Parker, for example, claimed to be in Nashville on a vacation; but contended that he personally had no luggage in the car in which he was headed home. Nobody would admit knowing anything about the origin of the car that they were using. All denied knowledge of the stolen money orders; yet one had been made payable to Ralph Canady and cashed, and another had been sought to be cashed by two men who left in a Michigan car that Parker, Hughes and Walker were in upon the Fisk campus a short time later.

Shortly before the five men decided to leave, the apartment where they were staying was the focal point of much police activity. A close study of the record will show that multiple police cars drove by the place, some more than once. It is logical to deduce that this, a relatively short time after two men in Hughes car had been chased away from a liquor store after attempting to cash one of the stolen money orders, was a precipitant for flight by those involved. Certainly all knew that guns were put in

the passenger compartment of the car. As soon as the car left the driveway one police car left behind it. A short distance away Officer Thomasson "had the car stopped and they tried to run over me." It is illogical to conclude that Officer Johnson was not trying to stop the car as soon as possible and as near to his superior as possible. There is circumstantial as well as direct evidence of a chase. The physical facts at the scene of the shooting would indicate that the car was stopped at the most advantageous place for escape. We do not have to find that Parker knew in advance that the officers would be shot, although he very well could have. It stretches reason to believe that two men, intending momentarily to shoot two policemen, would say nothing indicating this intention to three friends in the privacy of a closed car; and be so secretive that Parker would not know afterward who did the shooting. The totality of the evidence leads inevitably to the conclusion that the evidence does not preponderate against the guilty verdicts, and this court requires no more. Cooper v. State, 123 Tenn. 37, 138 S.W. 826; McBee v. State, 213 Tenn. 15, 372 S.W.2d 173; Gann v. State, 214 Tenn. 711, 383 S.W.2d 32; Troglen v. State, 216 Tenn. 447, 392 S.W.2d 925.

Various crimes by all or part of this group immediately preceded and led to these murders. A car had been feloniously converted and was being feloniously operated. License plates had been stolen and a car operated with stolen license plates thereon. Money orders had been stolen and some had been forged and passed and stolen money orders were being feloniously concealed and possessed. Deadly weapons were being carried with the apparent intent to go armed. A felonious assault with an

automobile was committed when an attempt was apparently made to run down Officer Thomasson. Arrest was resisted by flight, and by murder. It is the law of this state that where a common design to commit a felony is entered upon, the natural and probable consequences of which involve the contingency of taking human life, all entering upon the design are responsible for the acts of each committed in furtherance of such design, even though a resultant killing was not specifically contemplated. Moody v. State, 46 Tenn. 299; Irvine v. State, 104 Tenn. 132, 56 S.W. 845; Williams v. State, 164 Tenn. 562, 51 S.W.2d 482. The latter case states the rule, "* * * when men are assembled for an illegal purpose, the commission of an offense by any one of the party in pursuance of that purpose is the act of the whole."

All defendants complain of what they say was the irregular form of the verdict. Only Parker has any possible cause to do so. The jury first reported, in turn, by name, the finding of guilty of each defendant and the fixing of punishment at ninety-nine years. Then, the following was said:

"Foreman: However, Judge, if we may, the jury recommends leniency for the defendant Parker and will leave it to the discretion of the Court to establish his punishment.

"The Court: I'm sorry. I didn't hear the last part of your verdict.

"Foreman: I said, the jury, however, recommends leniency for the defendant Parker and will leave it to the discretion of the Court to establish his punishment.

"The Court: Well, as I understand your verdict, sir, you find the defendant Parker guilty of murder in the first degree and fix his punishment at ninety-nine years.

"Foreman: Yes, sir, with recommendation for leniency.

"The Court: Now, in order that the Court may understand your verdict, members of the jury, is it your verdict that you find all three defendants guilty of murder in the first degree?

"Foreman: Yes, sir.

"The Court: And that you fix the punishment of each defendant at ninety-nine years in the State penitentiary?

"Foreman: Yes, sir.

"The Court: Now, I want to be sure the Court * * * the jury must determine the question of guilt or innocence and then fix the punishment. Now, you have fixed the punishment at ninety-nine years.

"Foreman: Yes, sir.

"The Court: Right?

"Foreman: Yes, sir.

"The Court: All right, sir. You may be seated, please. The clerk will poll the jury."

The clerk thereafter, under the Court's order but without a motion, asked each juror, in turn, if his or her individual verdict was that all three defendants were guilty of murder in the first degree and their punishment fixed at ninety-nine years, with a recommendation for

leniency for the defendant Parker. Each replied in the affirmative.

No objection was made to the form of the verdict or the procedure followed in polling the jury. The defendants were formally sentenced, after which notice was given that motions for new trials would be filed.

The only irregularity is the recommendation of leniency for Parker. It is clear that the jury did, in fact, find all three men guilty and did fix the punishment of each at ninety-nine years. This is certain and unequivocal. The recommendation of leniency for Parker was more surplusage and did not render the verdict uncertain or invalid. Hannum v. State, 90 Tenn. 647, 18 S.W. 269; Senter v. State, 187 Tenn. 517, 216 S.W.2d 21.

■ ■ Error is assigned that the final argument for the State was inflammatory, and also that it dealt with a conspiracy when no conspiracy was charged. There is no merit to these contentions. First, the necessary objections were not timely made. Secondly, the argument was not improperly inflammatory. And thirdly, the "conspiracy argument" was in fact a proper argument relevant to the State's theory that the non-shooting defendant (or defendants) was guilty as a principal under T.C.A. § 39-109 defining aiders and abettors, the State contending that the offense was committed in the course of a common design in pursuit of a common purpose, rendering the act of one the act of all. Moody v. State, supra.

■ ■ Error is assigned to the testimony of the medical examiner as to the cause of death; and it is contended that the Court erred in not granting Canady's

motion to have the jury view the scene. These assignments are without merit.

■■ ■■ Allen assigns as error the trial Court's denial of his motion to have the names of the defendants listed alphabetically upon the presentment; the trial Court's refusal to quash the presentment upon motion that it did not give sufficient notice of the charge and had his name misspelled; and cites error in the introduction into evidence of a letter written by Allen admitting the shooting. These assignments have been examined and are without merit. Allen also asserts that the Court permitted inflammatory appeals to racial prejudice by the State, but we find the contrary to be manifestly true.

■■ Finally, Allen contends that his Plea in Abatement attacking the composition of the Davidson County Grand Jury should have been sustained, because (1) the Private Act under which the Grand Jury operates is unconstitutional, and (2) certain citizen groups have been systematically excluded from service. Counsel candidly states in his brief that he argues this Assignment of Error "realizing that it has been raised before with this Court and apparently the Court did not comprehend the argument." More accurately, the Court did not agree with the argument. See the opinion in the unreported case of McQuiddy v. State, filed August 27, 1969. See also Flynn v. State, 203 Tenn. 337, 313 S.W.2d 248. Nor has the defendant Allen borne the requisite burden of proof to establish purposeful and systematic exclusion of members of his race from Davidson County Grand Juries.

We have spent weeks carefully examining and studying this record and the questions raised. All have been care-

fully considered. We are of the opinion that the plaintiffs in error received a fair and legal trial and their convictions are well supported by the evidence.

All assignments of error are overruled, and the judgment of the trial Court is affirmed.

HYDER and MITCHELL, JJ., concur.