**Perry Lee TAYLOR, Plaintiff in Error,**

**v.**

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

Oct. 24, 1973.

Certiorari Denied by Supreme Court
Jan. 21, 1974.

John T. Henniss, Chattanooga, for plaintiff in error.

David M. Pack, Atty. Gen., Phillip W. Brooks, Asst. Atty. Gen., Nashville, John Seymour, Asst. Dist. Atty. Gen., Chattanooga, for defendant in error.

OPINION

OLIVER, Judge.

Represented by retained counsel, Taylor was convicted of first degree murder for the killing of his wife and was sentenced to imprisonment in the penitentiary for 99 years, and perfected an appeal in the nature of a writ of error to this Court. The technical record and the Bill of Exceptions were duly filed, but defense counsel failed

to file a brief or Assignment of Error in this Court.

On motion of the State pursuant to Tennessee Supreme Court Rule 17(6), this Court examined the technical record and the Bill of Exceptions, reviewed the issues raised in the defendant's motion for a new trial, and affirmed his conviction. Subsequently the defendant filed a petition under the Post-Conviction Procedure Act of this State, which the trial court dismissed without an evidentiary hearing, and this Court affirmed.

Taylor then filed a habeas corpus petition in the Federal District Court at Chattanooga. That Court found that the defendant had been denied effective assistance of counsel by failure of his retained attorney to prepare and file Assignments of Error or a brief, and ordered that the State either grant him a new appeal or a new trial. As a result, the State filed a petition in this Court asking that Taylor be granted a delayed appeal and that counsel be appointed to represent him. Whether rightly or wrongly, and it is pointless to belabor the matter, suffice it to say that this Court then vacated its order affirming Taylor's conviction upon direct appeal, and ordered filing of Assignments of Error and briefs. Thus, the case is again before us.

By his first three Assignments of Error, the defendant challenges the sufficiency of the evidence to warrant and sustain the verdict of the jury, insisting specifically that there was no evidence of premeditation.

About 6:00 p. m. the day of the homicide, the defendant, who had been separated from his wife for about two weeks and was living with his cousin, went to his wife's residence and talked with her at the door. She related that she was nervous and irritable, did not feel like talking and would call him when her nerves were settled. After he left she purchased a half a pint of gin and drank about half of it sometime during the evening. She told her daughter Gertha, who lived with her, that she was going to call the defendant and get things straightened out. It was stipulated that at 6:43 p. m. the deceased made an emergency call to the defendant.

During this same period, Gertha's friend Jerry Allen called and the deceased told him the defendant had said he had been spying on her. Allen denied the accusation and the deceased asked him to come over. She also made some notes in a notebook about the matters she intended to discuss with the defendant.

When the defendant returned to her home he and the deceased talked in the living room. Gertha retired to her bedroom to study for examinations. Some 15 minutes later, Jerry Allen arrived and the deceased asked him about the alleged spying. He denied the charge and the defendant said to his wife, "Well, and, we wasn't talking about that." Allen then joined Gertha in the bedroom and the door was closed.

About 45 minutes later, the deceased called Gertha in a high-pitched voice but did not sound alarmed. A shot was fired as Gertha started toward the door. She testified that she opened the door and saw the defendant standing in front of the deceased who was sitting on the couch; that the latter said, "Oh" and had her hands up and the defendant then shot her; that she (Gertha) said, "Oh, God, please don't let my mother die"; that the defendant said, "Oh, yes, she's going to die. But don't worry, I'm going to kill myself, too"; that he then took two cartridges from his pocket and reloaded the gun and pointed it at his chest; that she ran to the deceased's room and called an ambulance; that Allen then took her out the back door; that her mother did not have a gun around the house; that the defendant kept a gun under the mattress when he was living there and carried it when he went out; that once her mother gave her the gun and she hid it under some doll clothes, but it was later found; that the deceased had been in Moc-

casin Bend Hospital twice for a nervous condition; that the defendant had not been trying to get her re-admitted and that was not the reason the deceased wanted a divorce.

An attorney had prepared a divorce petition for the deceased but she had never signed it, and she had also discussed an injunction with him.

Jerry Allen testified that as Gertha got up to respond to her mother's call, he heard a shot, and heard another one as she opened the door; and that he heard the above statement by Gertha and the defendant.

The defendant shot his wife twice in the chest, one bullet entering above the collar bone and the other in the left breast, and she died almost instantly from the latter wound. Both bullets were fired "almost directly from front to back" and at a slightly downward angle. One bullet penetrated her right thumb and another creased her left index finger. At autopsy her blood-alcohol content was found to be .13 per cent.

The defendant testified that problems arose between him and the deceased because of her drinking; that the deceased's mother committed her to the hospital once, and she committed herself another time, and he had tried to get her to return to the hospital; that she had been talking about a divorce for three years; that he had been in contact with her several times during their separation; that she would call him at work and have him bring various things to the house; that he did not have a .38 caliber gun, but owned a .32 Browning automatic, which he gave to the deceased's step-father before the shooting; that the day of the homicide he learned from her cousin that she and Gertha and Paul Bonner had gone to Alabama that day; that later he went to the deceased's house to talk with her about filing their income tax return, but she said she was tired and did not feel like talking; that later, his cousin, with whom he lived, told him that the de-

ceased had broken into a telephone conversation with an emergency call, and that when he talked with her she told him to come over and said the matter could not wait; that he went to her house, but did not carry a weapon; that Jerry Allen came in and there was some discussion about his alleged spying activities; that "Then the first thing we discussed was the, she said that, 'I'm going to drink my Vodka, my liquor, as long as I want to.' And I cut through and I said, 'Well, do you mean to tell me you called me way over here just for something like this?' And she said, 'That's the reason you so dog-gone hard-headed', or something. Said, 'Reason we ain't getting along now.' I said, 'Only thing wrong with you', I said, 'You don't want to listen to nobody but yourself.' So, I shut up and she started back again. Then's when she come up with the Paul Bonner. And she said that Paul Bonner was doing things for her which she would have to pay back. I said, 'Well, my God', I said, 'Why wasn't he doing all these things when we was together?' And one word led from another"; that "I wasn't angry, but I wasn't pleased to be over there for just to be called on some kind of occasion like that, when she could have practically told me the same thing when I was over there Sunday evening"; that they continued to argue and she got up and began cursing and pulled a gun from her blouse; that he grabbed her hand trying to get the gun and it fired, and then fired again as he snatched it from her hand; and that he did not unload the gun and had not intended to hurt her.

Elsie Goddard, the defendant's cousin with whom he lived, testified that after her telephone conversation was interrupted by the emergency call it rang again and the defendant answered it and said, "is anything wrong . . . Well, O.K., I'll be over there in a few minutes"; and that she had not seen the defendant with a gun since he moved into her house.

■ Considered in the light of the well-known and oft-repeated rule govern-

ing appellate review of the evidence when its sufficiency is challenged on appeal in a criminal case, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135, we cannot say that the evidence preponderates against the verdict of the jury and in favor of the defendant's innocence.

As the sole and exclusive judges of the evidence and of the weight to be given to the swearing of each and every witness in the case, State v. Logan, 224 Tenn. 228, 453 S.W.2d 766; Gordon v. State, Tenn.Cr.App., 478 S.W.2d 911; Bailey v. State, Tenn.Cr.App., 479 S.W.2d 829, the jury rejected the defendant's story about how the killing occurred, and manifestly accepted the version of it given by the deceased's daughter and Jerry Allen.

■ Premeditation, which the defendant contends is not shown by the evidence, may be inferred from the manner of the killing, such as repeated shots or blows, Green v. State, 1 Tenn.Cr.App. 719, 450 S.W.2d 27, from acts of preparation such as procuring a pistol or other deadly weapon, 3 Warren on Homicide § 273, p. 162, or from proof of cool, calm, and circumspect deportment and bearing of the defendant when the killing was done or immediately preceding or subsequent thereto. Ibid., p. 172.

■ Premeditation involves a previously formed design or actual intention to kill. Such design or intention may be conceived and deliberately formed in an instant. It is not necessary that it should have been conceived or have pre-existed in the mind for any definite period of time before its execution. It is sufficient that it preceded the assault, however short the interval. Lewis v. State, 40 Tenn. 127; Tooley v. State, 1 Tenn.Cr.App. 652, 448 S.W.2d 683; Green v. State, supra; McGill v. State, Tenn.Cr.App., 475 S.W.2d 223.

■ The elements of premeditation and deliberation may be inferred from the circumstances of the killing. Edwards v. State, 221 Tenn. 60, 424 S.W.2d 783; Green v. State, supra; Tooley v. State, supra; McGill v. State, supra.

Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances in evidence. McGill v. State, supra.

The unrebutted evidence that the defendant and the deceased were not engaged in a shouting match or a violent physical encounter, that a significant amount of time elapsed between the first shot and the second shot, that the defendant was standing in front of the deceased as she was sitting on the couch when the second shot was fired, that both bullets entered the front of her body and followed an almost horizontal course, that after he shot her he stated that she was going to die and calmly reloaded the gun and said that he was going to shoot himself also, was clearly sufficient to warrant the jury's verdict. Upon this record the jury was fully justified in finding that the defendant deliberately and premeditatedly murdered his wife.

■ Finally, the defendant contends that the court erred in excusing the court reporter prior to the return of the jury's verdict. He raised no question about this matter in his motion for a new trial and he is, therefore, precluded from raising it on appeal. Hancock v. State, 1 Tenn.Cr.App. 116, 430 S.W.2d 892; State ex rel. Carroll v. Henderson, 1 Tenn.Cr.App. 427, 443 S.W.2d 689; Pruitt v. State, 3 Tenn.Cr.App. 256, 460 S.W.2d 385; Kirby v. State, 214 Tenn. 296, 379 S.W.2d 780; Supreme Court Rules, Rule 14(5).

Affirmed.

WALKER, P. J., and DWYER, J., concur.