John Henry SNEED, Jr., Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee.

Oct. 27, 1976.

Certiorari Denied by Supreme Court Jan. 24, 1977.

Thomas W. Moon and Bart C. Durham, III, Nashville, for appellant.

R. A. Ashley, Jr., Atty. Gen., Linda Ross Butts, Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., Chattanooga, for appellee.

## OPINION

RUSSELL, Judge.

The appellant, John Henry Sneed, Jr., appeals his convictions on two charges of first degree murder in the shooting death of Rufus Watts and Mary Johnson, for which convictions he received consecutive life sentences.

The initial assignment of error questions the legal sufficiency of the convicting evidence in each case. We hold that the assignment is without merit.

The evidence reflects that the bodies of James Rufus Watts, and Mary Johnson were found by relatives on the morning of March 26, 1973, in a Chattanooga, Tennessee house where the victims resided as man and wife. Each had a massive gunshot wound to the back of the head. Watts was lying face down in the hallway, while Mary Johnson was face down behind a bar in the den area of the house. A small child was also found, barely alive, in the den area. No weapons were found in the vicinity of either body. The only evidence of a possible struggle was a small broken glass figurine which was found in the den area. Watts' arms were outstretched in front of his head, and a rolled newspaper and a pack of cigarettes were in the vicinity of the outstretched hands. There was also evidence that Watts had keys in one hand.

The medical examiner testified that death to each was caused by a massive gunshot wound to the back of the head. Mary Johnson's was a contact wound. Watts was found to have been dead for three or four days, and Mary Johnson was said to have lived vegetatively about twelve hours longer than Watts.

Four days before the bodies were found, one Leon Williams encountered Watts in Chattanooga, and Watts was driving his pickup truck. Watts was well known to Williams, and Watts invited Williams to come by his home later that day to view a juke box that Williams was interested in buying. Williams, accompanied by one Margie Pollard, did go by Watts' home at about 6:00 p. m. He saw three cars in the driveway, two of which belonged respectively to Watts and Johnson, and the third being a Buick Riviera with Nashville license plates. Watts' truck was not there. Williams went to the back door and knocked. He could hear music and voices, but no one answered. He identified one of the voices as Mary Johnson's. The other was that of a male, but he could not identify the male's voice.

Williams and Pollard left and returned in thirty to forty-five minutes, this time finding all three cars plus Watts' truck present. Williams testified that he started to drive on by when Margie Pollard saw someone coming out of the front door. Williams turned his car around and parked it in front of the house. He and his companion then got out of his car and had a conversation in the street with the man who had emerged from the house. He identified that man as the appellant, John Henry Sneed, Jr. Williams testified that Sneed told them that Watts, Johnson and the baby had gone to the bus station. Williams and Pollard then left, and observed Sneed leave in the Riviera.

Margie Pollard testified and basically corroborated the testimony of Leon Williams. She first testified that the appellant appeared relaxed when they were talking with him in the street, but she later testified that he was sweating and nervous at that time.

The State, through Police Chief James Davis of Chattanooga, introduced a statement taken by him from Sneed on July 11, 1973, in Los Angeles, California. Sneed admitted being in the Watts house on March 22, 1973. He said that he had borrowed a car from a friend in Nashville and had driven it to Chattanooga to pay Watts $500.00 which he owed him. He stated that he had stayed at Watts' house until that evening, talking, watching television and listening to records. Sneed further stated

that Watts went out for a couple of hours during the afternoon, and that when Watts came back Watts and Mary Johnson got into a heated discussion. Sneed stated that he told Watts that he was going back to Nashville, and left the house. He stated to Chief Davis that he then saw a man known to him only as Leon, and a lady, and that he told them that Watts would prefer that they come back later. Sneed stated to the officer taking his statement that Watts had told him to say this. Sneed further stated that he then drove back to Nashville and returned the borrowed car. Sneed contended in this statement that both Watts and Johnson were alive when he left.

Chief Davis testified that the investigation continued for another year. As the result of other information received, Davis and Detective Lloyd Lemley went back to Los Angeles on July 29, 1974. They had with them two murder warrants for the appellant. On July 30, 1974, after advice of rights and the signing of a waiver of rights form, Sneed gave a tape recorded confession to both murders. He stated that he and Mary Johnson began to argue while Watts was gone on the afternoon of March 22, 1973; that she approached him with a gun and he then reached for a gun that was behind the bar; and that they struggled over the gun and it went off. Sneed confessed that he shot Watts after struggling with him in the hallway when Watts was going for a rifle.

It was further testified that during the airplane trip back to Tennessee that Sneed said that he threw the murder weapon into a river.

Chief Davis further testified that during the taping of the July 30, 1974 statement, the tape recorder was not turned off and on except to check to see if it was working at the beginning of the statement and to change the tapes. He denied that there was ever any promise made of a low bond in return for the July 30, 1974 statement. Davis said appellant did ask him about bond after the statement was completed. Davis testified that he told appellant a reasonable bond would not be opposed since he had

cooperated. Davis was corroborated on this point by witness David Paige.

Detective Lloyd Lemley of the Chattanooga Police Department testified that the taped confession was reduced to writing after he, Chief Davis and appellant returned to Chattanooga on August 1, 1974. Lemley testified that appellant read each page of the transcript and initialed it. The last page of the written transcript of the confession was signed by appellant.

David Paige, a California Drug Enforcement Agent, testified to a conversation he had with the appellant on June 25 or 26, 1974. At one point Paige asked, "You really didn't kill those two people anyway, did you Johnny?" Appellant's response was, "Well, you know how it is David. A nigger's got to do what a nigger's got to do." Paige informed Chief Davis of this response one week later in a telephone call.

Appellant took the stand in his own behalf. His testimony regarding the events of March 22, 1973 was similar to his July 11, 1973 statement. He testified that he was at the Watts house on March 22, 1973; that Watts left in the afternoon; that Watts returned a couple of hours later and immediately began to have a discussion with Mary Johnson; that he then told them he was leaving; that upon leaving the house he saw Leon and a lady; that he told them to come back later, or words to this effect, because Watts had told him to say this; and that he then left in a car borrowed from a friend in Nashville. On cross-examination appellant said that the car was a Riviera.

Appellant further testified that his July 30, 1974 confession was taken while he was "strung out" on heroin and that he needed a fix on this occasion. He also testified that he was promised a low bond in return for the confession. He said that he was in a small room with five officers at the time he gave this confession and that he feared for his personal safety. For these reasons he decided to cooperate and wait until he got to court to tell the real truth. Appellant also contended that the tape recorder was turned off and on repeatedly on this occasion and that the officers were "coach-

ing like Cecil B. Demille". He said he repeated whatever they told him to because of the factors outlined above. Throughout his testimony, appellant maintained that he was being tried for these murders because he had failed to cooperate with an investigation into drug related activities concerning Nashville Police Officers. He said that his failure to co-operate with this same investigation was the reason he had had to leave Tennessee.

Chief Davis was recalled after appellant finished testifying. He denied that there was any coaching during the July 30, 1974 statement.

We think the evidence was more than sufficient to support these verdicts. Photographs of the crime scene and the testimony of the coroner clearly reveal that both Watts and Johnson were shot in the back of the head. The female victim's wound indicated that she was killed by a shot fired from a gun that had been placed directly against the back of the skull. The photographs and testimony regarding the position of Watts' body do not suggest a man madly rushing for a rifle. No rifle was ever found in the house and no weapon of any kind was found in the area of either body. The photographs of Watts do suggest a man who was shot from behind while walking down the hallway in his house holding an afternoon newspaper and a pack of cigarettes. The newspaper was dated March 22, 1973.

■ Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances of the case, including the use of a deadly weapon upon an unarmed victim. *Clarke v. State,* 218 Tenn. 259, 402 S.W.2d 863 (1966). The manner in which Mary Johnson was killed clearly indicates circumstances from which the jury could infer that she was shot after her killer had premeditated and deliberated on the consequences of his act. Such premeditation and deliberation may be formed in an instant. *Clarke v. State,* supra. The jury could also infer from the circumstances of James Rufus Watts' death that he was killed by

someone who was lying in wait. This would be sufficient in itself to support a verdict of murder in the first degree. *Ervin v. State,* 4 Tenn.Cr.App. 682, 475 S.W.2d 211 (1971).

■ Upon leaving the Watts house, appellant told Leon Williams and Margie Pollard that Watts, Johnson and the baby had gone to the bus station. The victims' two cars and truck were parked outside the house at the time Sneed made this statement. Premeditation may be inferred from proof of a cool and calm bearing on the part of the appellant when the killing was done or immediately preceding or subsequent thereto. *Taylor v. State,* Tenn.Cr.App., 506 S.W.2d 175 (1973).

Of course we do not know exactly what factors convinced the jury of defendant's guilt, but we do hold that there was ample evidence presented to support the verdicts, even without his confession; and that the appellant has failed to carry the burden which is his on appeal to show that the evidence preponderates against his guilt. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173 (1963).

■ The second assignment of error cites several instances wherein it is contended that the State prejudicially showed criminal activity by the appellant which was unrelated to these murders. This assignment of error was not included in the motion for a new trial, in violation of Rule 14(5), *Rules of the Supreme Court,* which have been adopted by this Court. One may not raise questions for the first time in this Court, and the trial judge will not be put in error upon matters not brought to his attention in the motion for a new trial. *Bolin v. State,* 4 Tenn.Cr.App. 387, 472 S.W.2d 232 (1971). Not only was this assignment of error not raised in the motion for a new trial, but of the alleged instances of misconduct cited, only two were objected to at the trial. Objections to evidence are waived unless they are timely made and they cannot be raised for the first time on appeal. *Phillips v. State,* 2 Tenn.Cr.App. 609, 455 S.W.2d 637 (1970); *Stone v. State,* Tenn.Cr.

App., 521 S.W.2d 597 (1974). The two objections made came about when the State characterized a California defense attorney's advice to Sneed to keep silent as "impeding the progress of the police department", which statement was withdrawn upon objection; and when objection was made to questions asked of appellant on cross-examination regarding a case pending against him in California, which objection was sustained by the trial judge. The second assignment of error is overruled.

The third assignment of error is in two parts. First, it is contended that the statement made by appellant to David Paige, "A nigger's got to do what a nigger's got to do", was unconstitutionally admitted because no *Miranda* warnings were given. The second part of the assignment of error insists that the July 30, 1974 confession was unconstitutionally obtained from Sneed at a time when he was on heroin by the promise of bond leniency.

The first part of this assignment of error was not included in the motion for a new trial and no objection was made to the testimony concerning this conversation. This part of the assignment of error is therefore not properly before this Court. See Rule 14(5), *Rules of the Supreme Court*, adopted by this Court; *Bolin v. State*, supra; *Phillips v. State*, supra; and *Stone v. State*, supra. However, even if this alleged error were properly raised, it would still have no merit because we do not think this conversation occurred in the custodial interrogation setting that *Miranda* addressed itself to.

This conversation took place on June 25 or 26, 1974 while Agent Paige and Sneed were riding in Paige's automobile. Sneed had requested Paige's help in locating Mrs. Sneed who had been arrested. Appellant and his wife had been working with Agent Paige as informants. Paige testified that Sneed initiated the conversation in which the statement was made. Paige knew that the Chattanooga Police Officers had previously questioned appellant regarding the two murders since he helped set up the July 1973 interview with Sneed. Paige testified

that appellant asked him if he had heard anymore from the Chattanooga authorities about the murders in Chattanooga. Paige replied that as far as he knew the case was closed. Sneed responded that it looked like the investigation was opening up again and that according to the papers it was pointing toward him again. After some more conversation Paige asked appellant, "You really didn't kill those two people anyway, did you Johnny?". Sneed replied, "Well, you know how it is David. A nigger's got to do what a nigger's got to do".

Appellant testified that David Paige initiated the conversation in question. He corroborated Paige's testimony that the conversation took place in Paige's car while they were looking for his wife. Sneed denied saying, "A nigger's got to do what a nigger's got to do".

The United States Supreme Court said in *Miranda v. Arizona*, 384 U.S. 346, 86 S.Ct. 1602, 16 L.Ed.2d 694:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

Appellant requested this Drug Agent's help and he received it. He was not in custody while they were riding around looking for his wife. As appellant contends, it is probably true that the Chattanooga Police Department's investigation into these murders had focused on him by the time he made this statement. However, this fact would not require that he be given the *Miranda* warnings before he made this statement, because he was not in custody at the time. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

As mentioned earlier, appellant also contends in his third assignment of error that the July 30, 1974 confession was unconstitutionally obtained. Appellant contends that he was "strung out" and needed a fix of heroin when he made this confession. Appellant's attorney in California at that time testified he talked to his client by

telephone before the confession was given. He said that appellant sounded like a sick man when he talked to him. Chief Davis testified that in his professional opinion John Henry Sneed, Jr. was not withdrawing from drugs when he made this confession.

Appellant testified that Chief Davis told him on July 30, 1974 that they had to get a statement, that they didn't care how it went as long as it sounded good, that if appellant would do this he (Davis) would see that bond was set as low as possible. When they returned to Tennessee Sneed said that Davis did suggest to the judge that a low bond be set. Sneed in fact was released on a total bond of $10,000 for the two first degree murders a short time after his return to Tennessee.

Chief Davis specifically testified that any statements regarding bond were made after appellant completed his July 30, 1974 confession. He was corroborated in this by David Paige. Davis also specifically denied that he asked the Judge setting bond in Tennessee to set a low bond. He did acknowledge that upon their return to Chattanooga, bond was set at $10,000 and that appellant was back on the street within a week.

The defense brief cites *Smith v. State,* Tenn.Cr.App., 512 S.W.2d 619 (1974), in support of its argument that a promise of low bond in return for a confession renders that confession inadmissible. *Smith v. State,* supra, at page 621 says in part:

> "It is argued that the confession of the co-defendant could not have been voluntarily given because confessors' low bond was at stake. At the pre-trial hearing to suppress this confession the defendant Hopkins testified that the police officers promised to help him in obtaining a low bond in return for his confession. This was refuted by the testimony of all the police officers involved, whose testimony was unimpeached. This alone takes this case out of the framework of *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922, where the police officers corroborated the testimony of the defendant

in regard to the coercion used to solicit her confession."

The facts of this case are consistent with those in *Smith v. State,* supra. We therefore think that the case does not support the appellant's defense contention. In *Smith* the co-defendant's confession was held not to have been given involuntarily.

■ There is another reason why appellant's assignment of error regarding the July 30, 1974 confession cannot be sustained. Before Chief Davis' testimony began, the Defense made a continuing objection before the appellant took the stand and moved the court to strike the July 30, 1974 statement. After a hearing, (out of the presence of the jury), the trial court overruled the motion and made the following findings: that appellant was properly informed of his rights; that he did talk to this attorney; that the attorney did not advise him not to make a statement: but, even if he had, the appellant then proceeded, having had the advantage of his attorney's advice, to waive his rights; and that Sneed's attorney did not communicate with any of the police officers in attendance on this date. The determination of the trial judge as to the voluntariness of pre-trial custodial statements by the accused is conclusive on appeal unless the appellate court finds that the evidence touching those questions preponderates against the trial judge's findings. *Briggs v. State,* Tenn.Cr.App., 501 S.W.2d 831 (1973).

■ Assignment of error number four alleges that the Assistant District Attorney's closing argument was prejudicial. This assignment of error was also not raised in the motion for a new trial. Furthermore, of the instances cited as improper, only three were objected to at the time they were made. This Court will not consider an improper argument or remark of counsel unless objection is made at the time of argument. *Canady v. State,* 3 Tenn.Cr. App. 337, 461 S.W.2d 53 (1970); *Rye v. State,* Tenn.Cr.App., 532 S.W.2d 941 (1975).

■ The first of the objected to remarks indicated that appellant only had one conviction for wiretapping. After objection

this statement was withdrawn. Later the prosecutor argued, "That's the type of man you're dealing with. He will prostitute himself. He's done it in the past—he's done it in the very recent past". This statement was doubtless made to imply that appellant had perjured himself at the trial. An objection was made and sustained, and that part of the argument was ordered stricken from the record. In closing, the prosecutor argued for a punishment that would deter others contemplating such crimes. The trial court took the objection to this argument under advisement. Even if these questions were properly before us, we find nothing to show that they affected the verdict to the prejudice of the appellant, which is the applicable test. *Jenkins v. State,* Tenn.Cr. App., 509 S.W.2d 240 (1974).

■ The assistant district attorney did at one point interject his personal opinion as to the reliability of the appellant's testimony. This is, of course, improper. *State v. Beasley,* Tenn., 536 S.W.2d 328 (1976). However, as previously noted, no objection was made to this argument, and the assistant district attorney did go on to point out to the jury that there is a presumption that a witness will tell the truth, and that they would have to be the ultimate judge's of the witnesses' credibility. In the light of all of the evidence we do not find that this remark prejudiced the appellant. *Harrington v. State,* 215 Tenn. 338, 385 S.W.2d 758 (1965). The assignment of error is overruled.

■ By his fifth assignment of error the appellant contends that he was denied a fair trial because the trial court refused to admit into evidence certain exculpatory evidence. There is no merit to this allegation. The alleged exculpatory evidence included an inter-office memo of the Chattanooga Police Department regarding a telephone call received by the police. The call provided possible information regarding the murders. List of names found in the Watts house were also alleged to be exculpatory in nature. This information was in fact supplied to the Defense by the State.

The Defense contends that these names should have been admitted because they showed possible motives for murder that persons other than the appellant may have had. The trial court did not refuse to admit this evidence. The court did find that it was premature to admit these names when the relevancy had not yet been proved.

The trial court found the memo to be possibly exculpatory, but also found it to be multiple hearsay; and ruled that the State had carried its burden regarding the memo when it was turned over to the Defense. We concur.

All of the assignments of error having been carefully considered and overruled, the convictions are affirmed.

GALBREATH and DAUGHTREY, JJ., concur.