Harvey G. AMBURN, Sr., alias, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee.

June 9, 1977.

Certiorari Denied by Supreme Court Aug. 1, 1977.

Philip P. Durand, Knoxville, for appellant.

Brooks McLemore, Atty. Gen., David L. Raybin, Asst. Atty. Gen., Nashville, Albert L. Witt, Ralph E. Harwell, Asst. Dist. Attys., Knoxville, for appellee.

## OPINION

TATUM, Judge.

This is a matricide in which the defendant, Harvey G. Amburn, was convicted of the first degree murder of his mother, Mrs. Ollie Amburn. He was sentenced to death by electrocution but the punishment was commuted by the Governor to life imprisonment. The judgment as commuted is affirmed.

On appeal, the defendant questions the constitutionality of the Tennessee Death Penalty Statutes, the sufficiency of the evidence, and the competency of evidence. Other assignments were made which have been rendered moot by the Governor's commutation.

■ We will first consider the fifth assignment of error which states that the evidence preponderates against the finding of premeditation and deliberation, and therefore, the guilty verdict of murder in the first degree is not justified.

The defendant and the victim shared the same residence. The victim had been dis-

traught with the defendant for cashing her Social Security checks. Mrs. Mildred Whitaker, the victim's sister-in-law, testified that within one month prior to the date of the death of Mrs. Amburn, the defendant "seemed to be mad at her [Mrs. Ollie Amburn] all the time." About a month prior to Mrs. Amburn's death, the defendant "was cursing her [Mrs. Amburn], said she ought to be dead, he ought to take a gun and shoot her . . ."

On Sunday, November 9, the deceased was visiting her sister-in-law, Mrs. Lillie Whitaker. The defendant drove her home that night. On Monday, November 10, the defendant's girlfriend, Margaret Price, attempted to telephone the deceased two times but received no answer. In the late afternoon, the defendant answered the telephone and told Ms. Price that his mother was around somewhere ". . . probably out in the yard." Lillie Whitaker also attempted to telephone the deceased four or five times on Monday, November 10, but received no answer. She telephoned four or five times on Tuesday, November 11. At about 6:00 o'clock P.M., the defendant answered the telephone. He first told Mrs. Whitaker that the deceased "must be in the yard," and upon further questioning, told her that the deceased "must have gone to Warren's" (in Virginia).

Harvey Amburn, Jr., son of the defendant, testified that he and his wife went to the Ollie Amburn residence at about 4:45 P.M., on Monday, November 10, to borrow money from the defendant. He saw a spent .22 caliber cartridge on the kitchen table. While there, he observed the deceased lying in bed and testified that she was lying in the same position as shown by photographs taken incident to the homicide investigation by police officers. Harvey Amburn, Jr., did not see his grandmother's wound and thought that she was asleep.

On the next day, Tuesday, November 11, at about 5:30 P.M., Harvey Amburn, Jr., again visited the home of the deceased. The defendant told him that he had killed Mrs. Amburn, using the bullet that was on the kitchen table. The defendant requested Harvey Amburn, Jr., to assist him in loading the body of the deceased into an automobile. Harvey Amburn, Jr. telephoned the police after conferring with his brother, Allen. The police arrived at the Amburn home at about 8:00 o'clock P.M., on 11 November 1975.

The police found Mrs. Amburn in bed with a bullet wound in the top of her head. The bullet was found lodged in her neck. There was no indication of a struggle and there was nothing inconsistent with her having been asleep at the time she was shot. She could have died at 3:00 or 4:00 o'clock A.M., on Monday morning, November 11.

A .22 caliber rifle owned by the defendant fired the bullet that killed Mrs. Amburn. The rifle was found at the scene of her death.

The defendant told the police officer that he observed one of his sons, Gordon Amburn, shoot Mrs. Amburn at about 4:00 o'clock A.M., on Monday, November 10. The defendant gave the police officer no reason for not reporting this alleged occurrence. Gordon Amburn testified that he was at home in bed at that time.

A handwriting expert testified that a letter purportedly written by Ollie Amburn, which would have cast suspicion upon Gordon Amburn, was written by the defendant. This letter was sent to Mrs. Whitaker by the defendant after he was incarcerated. The handwriting expert also testified that a check dated 10 November 1975, made to the defendant in the sum of $40.00, purporting to have been made by the deceased, bore the handwriting of the defendant with the possible exception of the signature. The endorsement on the check was the genuine signature of the defendant. This check was cashed at a tavern on November 11.

The defendant offered no evidence.

■ We cannot sustain Assignment V without finding that the evidence preponderates against the verdict of the jury finding the defendant guilty of murder in the first degree. *State v. LaChance,* 524 S.W.2d 933 (Tenn.1975); *Taylor v. State,* 506 S.W.2d 175 (Tenn.Cr.App.1973). We find abundant evidence in the record supporting the jury verdict finding the defendant guilty of murder in the first degree, including the elements of deliberation and premeditation. This assignment is overruled.

The defendant's third assignment of error is as follows:

"The Court erred in allowing the prosecution witness Richard L. Shipp to testify as to comparison of writings allegedly made by the appellant with the writings or signatures introduced for that purpose as the genuine writings or signatures of Ollie G. Amburn, and to express opinions that writings reputedly made by Ollie G. Amburn were not in fact writings of Ollie G. Amburn, but were writings made by the appellant, Harvy [sic] G. Amburn, Sr."

Mr. Richard L. Shipp, an expert witness on handwriting and questioned documents, compared known and undisputed specimens of the handwriting of the deceased and of the defendant with the handwriting on the letter that was purportedly written by the deceased and which might have cast suspicion on Gordon Amburn. He also compared the known handwriting specimens of the deceased and the defendant with the writings on the face of a check and other writings that were purportedly written by the deceased. He was allowed to testify that in his opinion, these questioned writings were not written by the deceased, but were, in fact, written by the defendant. It is the defendant's contention that under T.C.A. § 24–708, the expert testimony was not admissible to show that the defendant did in fact write these questioned documents. The defendant contends that the expert could go no further than state his opinion that the deceased did not write them.

T.C.A. § 24–708 provides as follows:

"24–708. *Handwriting comparison.*—In all the courts comparison of disputed writing or signatures with any writing or signature proved to the satisfaction of the judge to be genuine, shall be permitted to be made by expert witnesses, and such writing or signatures, and the evidence of expert witnesses respecting the same, shall be submitted to the court, or courts, and jury as evidence of the genuineness, or otherwise, of the writing or signature in dispute."

The defendant relies on *Franklin v. Franklin,* 90 Tenn. 44, 16 S.W. 557 (1891). This was a will contest and the issue was the genuineness of the handwriting of an holographic will. The contestants sought to prove by an expert witness that the will did not bear the genuine handwriting of the decedent and further, that it was forged by the proponent. The Court held that T.C.A. § 24–708 authorized expert opinion evidence that a document was a forgery, but did not authorize such evidence to prove the identity of the forger. In *Franklin v. Franklin, supra,* the Supreme Court was following the New York case, *Peck v. Callaghan,* 95 N.Y. 73 (1884). This is no longer the law in New York. In 7 Wigmore, Evidence § 2016, 223, n.1 (3rd Ed. 1940), Professor Wigmore says:

". . . the first statute, authorizing a comparison of 'a disputed writing with any writing proved . . . to be genuine' received an astounding construction in 1884 (*Peck v. Callaghan,* 95 N.Y. 73) when the Court refused to admit genuine specimens of the alleged forger of a document in order to prove it his forgery; thus (1) the words *'any writing'* were made meaningless, and (2) the statute was made to help all forgers and to handicap their victims; compare the contrary rulings in England and Missouri; perverse legal thinking could hardly go further; and in 1888 (c. 555) the Legislature was obliged again to correct the Court; . . ."

We agree with Professor Wigmore that "perverse legal thinking could hardly go further" and we will not attempt to take it further by following *Franklin v. Franklin, supra,* and *Peck v. Callaghan, supra.* The holdings in these cases are contrary to the express provisions of T.C.A. § 24–708. We hold that expert witnesses may compare authenticated specimens of handwriting with disputed writings to determine (1) whether the disputed writing has been forged, and (2) if the expert concludes that the document is a forgery, the expert can compare it with authenticated writings to determine the identity of the person who forged it. The expert's testimony in both instances is admissible in evidence to prove not only that the document was a forgery, but the identity of the forger. We think that this is the logical rule and the holding mandated by the express terms of the Statute. *See,* D. Paine, Tennessee Law of Evidence § 227, at 244 (1974). Assignment III is overruled.

The fourth assignment is:

"The Court erred in allowing prosecution witness Lillie Whittaker [sic] to testify, over objection to to [sic] conversations between her and Ollie Amburn which took place two or three months before her death."

The record reflects that Lillie Whitaker testified concerning several conversations between Ollie Amburn and the defendant which occurred two to three months prior to Ollie Amburn's death. In one conversation, the defendant told the deceased that he intended to kill his son, Gordon Amburn. In the other conversation, the defendant expressed displeasure when the deceased said that she was going to have her Social Security checks sent directly to her bank, discontinuing the practice of having them sent to her home. She had not received some of these checks.

We think that the defendant's feeling of animosity towards his son, Gordon, is relevant in view of the defendant's statement to the police officers that he saw his son, Gordon, kill his mother. It was also relevant that the defendant and the victim were in disagreement about the victim's Social Security checks. This assignment is overruled.

The Supreme Court, in *Collins v. State,* 550 S.W.2d 643 (Tenn.1977), held the mandatory provisions of the Tennessee death penalty statutes to be unconstitutional. Since the death penalty was imposed in this case, Honorable Ray Blanton, Governor of Tennessee, has commuted the defendant's death sentence to life imprisonment. Under authority of the Tennessee Supreme Court's Opinion on the Petition to Rehear in *Collins v. State, supra,* and finding no other error in the record, we affirm the judgment of the Criminal Court of Knox County, as commuted by the Governor.

WALKER, P. J., and DUNCAN, J., concur.