Kennon LAIRD, Petitioner–Appellee,

v.

Larry LACK, et al.,
Respondents–Appellants.

No. 88–6156.

United States Court of Appeals,
Sixth Circuit.

Argued March 28, 1989.

Decided Sept. 7, 1989.

Rehearing and Rehearing En Banc
Denied Oct. 13, 1989.

Henry A. Martin (argued) and Richard Moore, Fed. Public Defenders, Federal Public Defenders Office, Nashville, Tenn., for Kennon Laird, petitioner-appellee.

W.J. Michael Cody, Atty. Gen., pro se and Jerry Smith (argued) and Norma Crippen Ballard, Asst. Attys. Gen., Office of the Atty. Gen. of Tennessee, Nashville, Tenn., for Larry Lack, Warden, et al.

Before MERRITT and NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

A Tennessee jury found Kennon Laird and his co-defendant, Moses Coury, guilty of the offense of assault from ambush.* After exhausting his state court rights of appeal, Mr. Laird sought and obtained the federal writ of habeas corpus that we are called upon to review in this appeal. The question presented is whether, under the federal constitutional standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence adduced at Mr. Laird's trial was sufficient to support the jury's verdict. Finding that it was, we shall reverse the judgment of the district court and direct that the writ of habeas corpus be vacated.

**I**

Viewed in the light most favorable to the prosecution, as required by *Jackson,* see *id.* at 319, 99 S.Ct. at 2789, the evidence discloses the following sequence of events. At about 11 p.m. on Sunday, June 14, 1981, Kennon Laird and Moses Coury, who were

---

* Tennessee Code § 39–2–107(a) provides: "Any person who lies in wait for another and willfully and maliciously assaults him from ambush with a deadly weapon, with intent to cause death or great bodily harm, shall be guilty of a felony...."

driving a pickup truck with Arizona plates, appeared to have run out of gas on Arnold Road in a section of rural Tennessee not far from Nashville. The truck came to a stop near the driveway to the home of Billy Wilson, the individual who was to be ambushed the next day.

Earl Dodd and his son, Earl Dodd, Jr., lived a hundred yards or so farther down Arnold Road. Observing the stationary truck with Laird standing beside it, they stopped to see if they could be of help. On being told that the truck was out of gasoline, the Dodds retrieved some from their home. Earl Dodd, Jr., engaged Coury in conversation as the truck was being fueled. Before the truck drove off—which it did at about the time Billy Wilson was arriving home—Coury told young Dodd that he was from Arizona and that he couldn't get out of the truck because he had a bad back. Because of several break-ins in the area the Dodds wrote down the license plate number (Arizona 2RG996) and made a mental note that the pickup was a two-tone green Chevrolet.

At 5:00 or 5:30 on Monday afternoon, June 15, 1981, Tim Smith returned to his home on Lynch Road. Lynch Road was a cul-de-sac that ran off of Arnold Road at an acute angle. Mr. Smith's house was only a few hundred yards from that of Billy Wilson; a pasture and a cultivated field separated the two houses.

As he reached his house, Mr. Smith saw a pickup truck parked on the side of Lynch Road. He observed a man resting on the steering wheel with his face down. Mr. Smith considered the man's presence odd, since there were only three houses on the road and there was no apparent reason for anyone to be there.

Another Lynch Road resident, William "Wink" Brown, also noticed the pickup truck on arriving home from work. Mr. Brown went to his mailbox to get his mail and was told by Tim Smith that the truck had been there a little while. The two men decided to ask the man in the truck why he was there.

The occupant of the truck, whom Mr. Brown and Mr. Smith would later identify as Mr. Coury, said that he was having family problems and had stopped to try to sort things out. Wink Brown asked Coury to leave, and Coury said that he would do so as soon as he had his thoughts together. Mr. Brown observed that the pickup was a two-tone green Chevrolet or GMC truck. Mr. Brown wrote down the truck's license plate number, 2RG996, but because the tailgate was down he could not see what state had issued the plate. He did see the words "Grand Canyon State" on the bottom of the license, and he made notes reading "Grand Canyon, Colorado" and "Arizona?" Mr. Brown observed that Coury appeared to be hot and smelled of drink.

At about 5:15 that same afternoon Billy Wilson returned home from Nashville. He parked his car in front of his house and walked around to the back door. As he was unlocking it, gunshots rang out. Mr. Wilson was struck in the back. He fell through the doorway and managed to get to a bedroom. From there he called his son, who took him to the hospital.

The police went to the scene and discovered five spent .45 caliber shells near a broken window in an unused dairy barn behind the Wilson home. Near the window was a rusty metal chair. A police dog picked up a trial that led in a straight line across a freshly plowed field, through a fence row and a stand of trees, across a creek, into a wooded area, through another fence, and onto Lynch Road.

The police questioned Wink Brown at around 9:30 that night and learned of the pickup truck that had been parked on Lynch Road earlier in the day. Mr. Brown gave the officers a description of the truck and its license plate number, along with a general description of the man who had been sitting behind the wheel.

Earl Dodd, Sr., heard about the shooting as he listened to his police scanner several hours later. He gave Sheriff Fleming Williams the paper on which he had written down the license number of the pickup parked on Arnold Road on Sunday night, and he gave Sheriff Williams a description of the man who had been standing beside the truck.

A police bulletin was then issued asking law enforcement officers along Interstate 40, west of Nashville, to be on the lookout for a two-tone green '77 Chevrolet pickup bearing Arizona license number 2RG996. The bulletin also described the truck's probable occupants.

Two Oklahoma police officers stopped the truck in Henrietta, Oklahoma—more than 600 miles from Nashville—early in the morning of June 16, 1981, about 11 hours after the shooting. Laird and Coury were in the truck. Coury denied that he had been involved in the shooting and told the officers that he and his companion were coming from Arizona, not from Tennessee. The men were eventually taken into custody. Coury was carrying a suitcase, which the officers confiscated.

Sheriff Williams traveled to Oklahoma and inspected the pickup truck and the suitcase pursuant to a search warrant. Inside the truck he found a Grand Ole Opry manicure set, a Tennessee travel aid, a Nashville magazine dated June 15, 1981, a matchbook from the Sheraton South Motor Inn in Nashville, and a plastic bag from Nashville's American Ice Company. The suitcase contained clothing of two men and personal toiletries.

Sheriff Williams removed two pairs of pants, two short sleeved shirts and a pair of socks. He sent them, along with the metal folding chair that had been found in the dairy barn at the scene of the ambush, to the FBI crime lab in Washington, D.C. It is undisputed that the clothing tested by the FBI—clothing designed for a man of Laird's unusual girth—was in fact Laird's.

FBI Agent Robert Webb analyzed paint particles found in the shirts and trousers. He also analyzed the paint that was on the chair at the ambush site. He determined that the paint in the clothing matched that taken from the chair.

## II

*Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979), instructs federal courts not to issue writs of habeas corpus on insufficiency of the evidence grounds unless "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." The court below recognized that it was required to apply the *Jackson* standard, but it attempted to do so in conjunction with Tennessee's rule that "where a conviction depends upon circumstantial evidence, all the facts and circumstances revealed by the evidence when put together must unerringly point the finger of guilt to the accused on trial beyond a reasonable doubt to the exclusion of all others." Later in its opinion the court said:

> "A rational jury could find beyond a reasonable doubt from the circumstance of the 'F.B.I.'s analysis of [his] clothing that Laird had been in Wilson's barn, sitting in the folding chair...' These circumstances do not support, however, any further inference that it was Mr. Laird to the exclusion of all other persons, who proceeded from that position to attack Mr. Wilson unexpectedly and by surprise."

And again the court wrote:

> "It is difficult for this Court to comprehend just how a rational trier of fact could make all the inferences required from the evidence of the paint on Mr. Laird's clothing, all the way to the 'ultimate determination' beyond a reasonable doubt that he had lay [sic] in wait for Mr. Wilson, assaulted Mr. Wilson from ambush with a deadly weapon, willfully and maliciously, with the intent to kill Mr. Wilson or do him great bodily harm, to the exclusion of all other persons."

The district court did not have the benefit of our opinion in *York v. Tate,* 858 F.2d 322 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1960, 104 L.Ed.2d 428 (1989). In *York* we considered whether "the *Jackson* standard must be applied in conjunction with the Ohio common law rule which provides that where 'circumstantial evidence alone is relied upon to prove an element essential to a finding of guilt, it must be consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence.'"

*Id.* at 323 (citations omitted). In *York* we found that the constitutional standard of review established in *Jackson v. Virginia* was irreconcilable with the Ohio common law rule:

"In *Jackson v. Virginia,* the Supreme Court was careful to emphasize that the federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner. . . .

By applying the [Ohio] rule to test the sufficiency of the evidence in the instant habeas proceeding, the district court exceeded the scope of its proper role by impermissibly dismissing the reasonable conclusions of the jury. . . .

. . . By applying the [Ohio] rule, the district court turned the *Jackson* standard on its head. Rather than asking whether *any* reasonable juror could have found petitioner guilty, the district court considered whether any reasonable juror could have found the petitioner *not* guilty."

*Id.* at 329–30.

■ Like the Ohio rule, the Tennessee rule cannot be reconciled with the federal constitutional standard—for "in *Jackson* the Supreme Court expressly rejected 'a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt. . . .' " *York,* 858 F.2d at 330 (quoting *Jackson,* 443 U.S. at 326, 99 S.Ct. at 2792). If every alternative hypothesis need not be ruled out beyond a reasonable doubt, we believe that a rational juror could well have found with the requisite degree of certitude that Laird lay in wait for Mr. Wilson and assaulted him from ambush in violation of the Tennessee statute.

The truck in which Laird and his fellow Arizonan were traveling was parked at the time of the shooting on a seldom used road behind Mr. Wilson's house, where it had been the night before. The analysis of paint debris on Laird's clothes suggests that he—or possibly Coury, whose clothing was in the same suitcase—secreted himself in the barn while waiting for Mr. Wilson to return home. Inasmuch as Coury was seen sitting in the truck at about the time of the assault, it would not be irrational for a juror to conclude that it was Laird, and not Coury, who lay in wait in the barn and fired the shots that felled Mr. Wilson.

The district court did not think that it could be concluded from "the evidence that Mr. Laird did any unlawful act as regards Mr. Wilson willfully and intentionally and without legal justification or excuse, except trespass upon his property, [and] there are no circumstances in evidence reflecting the malicious state of mind of Mr. Laird at the time charged in the indictment." We disagree. If Laird was trespassing on Wilson's property, the jury was clearly entitled to infer that he was there to shoot him. There simply is no other reasonable explanation for Laird's presence in an unused dairy barn in rural Tennessee several hundred yards from the nearest public road. The hail of bullets belies the notion that the assault was a mistake or was committed without malice. Nor is it a point in their favor that the men immediately headed toward Arizona, obviously driving all night, and then lied to the police about where they had been.

Laird argues that because the clothing of the two men had been commingled in the suitcase, thus making it possible that paint chips from Coury's clothing had come off on Laird's, the FBI could not rule out the possibility that Coury had been the one sitting in the rusty chair waiting for Mr. Wilson. As we have indicated above, however, such a possibility does not have to be excluded beyond a reasonable doubt. Under the law of Tennessee, moreover, one who is guilty of aiding and abetting is a principal offender. *Wade v. State,* 174 Tenn. 248, 251, 124 S.W.2d 710, 712 (1939); *State v. Lequire,* 634 S.W.2d 608, 613 (Tenn.Crim.App.1981). Constructive presence at the crime is sufficient to support a finding of aiding and abetting. *Watson v. State,* 158 Tenn. 212, 217–18, 12 S.W.2d 375, 377 (1928). Presence and coordinated conduct before and after the offense are circumstances from which participation in the crime can be inferred. *State v. McBee,*

644 S.W.2d 425, 428–29 (Tenn.Crim.App. 1982).

Laird was with Coury at the entrance to Mr. Wilson's property on the night before the assault. Their presence on this rural road late at night invites the conclusion that they either were casing the site for an assault the following day or were waiting for Mr. Wilson to arrive in order to assault him immediately. The men's presence in Oklahoma only hours after the crime strongly suggests that Laird facilitated the getaway as well as the preparation.

### III

■ On the basis of *Jackson v. State,* 180 Tenn. 158, 172 S.W.2d 821 (1943), the district court concluded that Laird could have lain in wait for Wilson in violation of the statute only if the shooting occurred "under the cover of darkness." The statute itself imposes no such requirement, and although the crime in *Jackson v. State* happened to have been committed under cover of darkness, nothing in the opinion says that a shooting "under the cover of darkness" exhausts the meaning of "lying in wait." On the contrary, the opinion quotes a treatise on homicide for the proposition that "concealing one's self for the purpose of killing another unawares is lying in wait." *Id.* at 162, 172 S.W.2d at 822. Other Tennessee courts have found the "lying in wait" element to be satisfied by various concealments other than concealment in darkness.

In *State v. Lee,* 631 S.W.2d 453, 454 (Tenn.Crim.App.1982), the Tennessee Court of Criminal Appeals said that evidence showing that "the defendant sat in a vehicle for some time near the scene of the shooting" was a proper basis "from which the jury could infer he lay in wait for the deceased." In *Sneed v. State,* 546 S.W.2d 254, 258 (Tenn.Crim.App.1976), "the evidence suggested that the victim 'was shot from behind while walking down the hallway in his house holding an afternoon newspaper and a pack of cigarettes.'" According to the *Sneed* court, "the jury could ... infer from the circumstances of [the victim's] death that he was killed by some-

one who was lying in wait." *Id.* And in *Ervin v. State* the Tennessee appellate court found under these circumstances that the defendant had been lying in wait:

"There is evidence in this record that Ervin: (1) learned of his ex-wife's boy friend a week before the encounter; (2) got his rifle out of pawn; (3) left the car and went onto his ex-wife's premises with the rifle loaded; (4) gave his friend instructions to park defendant's car some blocks away from the house; and (5) waited in the back yard until deceased drove up and then went to the front and shot deceased when he started out the door. We are disposed to state that these factual events connote defendant was lying in wait, which would be of a sufficiency in itself to support a first degree murder conviction."

4 Tenn.Cr.App. 682, 475 S.W.2d 211, 212–13 (1971).

The judgment of the district court is REVERSED, and the case is REMANDED to the district court with instructions to vacate the writ of habeas corpus.